**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PATRICIA TOMASELLO,**<br>**11239 Ashby Drive**<br>**Fredericksburg, VA 22407**<br><br>**MARTIN MCMAHON**<br>**1717 K Street, NW, Suite 900**<br>**Washington, DC 20006**<br><br>                    **Plaintiffs,**<br>**v.**<br><br>**JAMIE GREENZWEIG;**<br>**12000 Government Center Parkway,**<br>**Suite 549**<br>**Fairfax, VA 22035**<br><br>        **and**<br><br>**HASINA LEWIS;**<br>**4103 Chain Bridge Road, Suite 401**<br>**Fairfax, VA 22030**<br><br>        **and**<br><br>**MICHAEL T. REILLY**<br>**15471 Waters Creek Drive**<br>**Centreville, VA 20120**<br><br>                 **Defendants.** | **Civil Action No. _____** |

**COMPLAINT WITH JURY DEMAND FOR: VIOLATIONS OF 42 U.S.C. § 1983,
42 U.S.C. § 1985, BREACH OF CONTRACT, NEGLIGENCE, MALICIOUS
AND INTENTIONAL INTERFERENCE IN PLAINTIFF TOMASELLO'S
CONTRACTUAL RELATIONSHIP, AND LEGAL MALPRACTICE**

Plaintiffs Patricia Tomasello ("Tomasello") and Martin McMahon ("McMahon"), by and

through their undersigned counsel, Mark G. Chalpin, Esq., respectfully sue Defendants Jamie

Greenzweig ("Greenzweig"), Hasina Lewis ("Lewis"), and Michael T. Reilly ("Reilly"). As

detailed herein, Defendants conspired to obstruct justice to secure the dismissal of Tomasello's

case entitled *Tomasello v. Reilly* (hereinafter the *Tomasello* case), which had been filed in Fairfax

County Circuit Court by McMahon's law firm. In the process of obstructing justice and securing

the dismissal of that lawsuit, Defendants violated at least three criminal statutes—42 U.S.C. §§ 1983 and 1985, and Code of Virginia statute § 18.2-460—and various Virginia professional rules governing attorney conduct in the Commonwealth. They made sure that no local Virginia attorney would be present in Circuit Court representing Tomasello to defend against dispositive motions filed by Greenzweig on behalf of the Fairfax County Fire Department ("FCFD"). The absence of local counsel ensured that: a) Tomasello's arguments would not be heard by the Court; and b) the result would be dismissal with prejudice of the *Tomasello* case leaving her without a remedy to pursue in Fairfax County.

Greenzweig, consistent with the goal of the civil conspiracy to obstruct justice in the *Tomasello* case, scheduled dates for oral argument on substantive issues (*e.g.*, demurrers) knowing that Lewis, Tomasello's local counsel, would not be present on those dates. As a direct result of the failure to have local counsel present at these hearings and, eventually, Lewis' sudden dropping out of the case, Tomasello's case was dismissed with prejudice. Lewis did not appear because she had been threatened by Greenzweig with a sanctions motion and a possible bar complaint if she did not abandon the *Tomasello* case. That was the same tactic used successfully by Greenzweig to convince Tomasello's two former local counsels to withdraw from the case.

Lewis had to employ that tactic here because Judge Kassabian had denied FCFD's demurrer and allowed the case to go forward on two counts - malicious interference and civil conspiracy. That initial favorable ruling by Judge Kassabian was dangerous precedent for FCFD and for a "dinosaur" like Reilly who hated the County's affirmative action program. Even though Tomasello had won numerous awards and received excellent annual performance ratings, Reilly was convinced that the only reason she was in his department was because she was black and female.

## **PARTIES INVOLVED**

1. As detailed in *Tomasello v. Reilly*, a civil action in Fairfax County Circuit Court, Case No. CL 2016-0007306, Tomasello is domiciled in Virginia and has been employed by FCFD for over 20 years. She learned very early on as a recruit how racist the department was, *i.e.*, she was told "the only reason you're here is because you're black and female." She experienced severe work place harassment, including the fact that she had to be removed from an arson investigation squad for no reason at all. Even though she was on light duty status, she was ordered out on fire runs after undergoing chemotherapy treatment. Reilly had been trying to run her out of the department ever since she had started working under him.

2. McMahon and his law firm filed the *Tomasello* case in Fairfax County to seek justice for Tomasello after her federal Title VII case had been dismissed in the Eastern District of Virginia (E.D.V.A.). He has an active litigation practice and his office is located in Washington, D.C. Lewis visited that office at least once and contracted with both Tomasello and him to serve as local counsel in the state case.   McMahon is now the subject of a bar complaint filed by Greenzweig in this District, which complaint has not yet been adjudicated.

3. Greenzweig is a senior attorney with the Fairfax County Attorney's Office and, on information and belief, is domiciled in Virginia.   She has had significant experience in litigation and especially in Fairfax County Circuit Court. During the *Tomasello* case, she had expressed to Tomasello's attorney nothing but contempt and disgust for Tomasello, despite the fact that her FCFD clients had sexually harassed Tomasello on numerous occasions and sent her out on fire runs right after she underwent chemotherapy. As Greenzweig told McMahon, she resented the fact that Tomasello had the nerve to file a second case in Fairfax County Circuit Court after her E.D.V.A case had already been dismissed. Greenzweig had been lead counsel for FCFD in

that federal case and was criticized by Reilly for allowing a new *Tomasello* case to be filed against FCFD in state court.

4. Lewis is domiciled in the District of Columbia and has a small litigation practice in Fairfax County. She agreed to act as Tomasello's local counsel in the *Tomasello* case and negotiated an employment contract with McMahon in this jurisdiction on behalf of Tomasello. Contrary to the contractual obligations she undertook to represent Ms. Tomasello and her affirmative representation to represent her to the best of her ability, she literally abandoned the case in mid to late January of 2017. After a series of meetings with Greenzweig, as documented in the bill Lewis sent to McMahon for legal services rendered in the case, she agreed to obstruct justice and conspired with Greenzweig and Reilly to secure dismissal of the *Tomasello* case. She was afraid after being threatened by Greenzweig with a sanctions motion and a possible bar complaint that her professional career would be permanently damaged if she did not conspire with the other Defendants to have the case dismissed.

5. Reilly is domiciled in Virginia and has been working with FCFD for over 20 years. His most recent rank was Deputy Fire Chief and, in that capacity, he started a campaign to rid the fire department of Tomasello as soon as she came into the department. The subordinates whom he directly supervised engaged in tortious and criminal conduct on the job against her, which he thought would convince Tomasello to resign from the fire department. Based on a pretext, he eventually transferred her into a civilian position, where Tomasello still works in today at a severely reduced salary with a significant loss of job benefits.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Tomasello's federal claims based on 28 U.S.C. § 1331. Lewis conspired with state actors (Greenzweig and Reilly) to deprive Tomasello of a fundamental civil right she was entitled to, to prosecute a law suit in Virginia state court, in

4

violation of 42 U.S.C. § 1985, and they obstructed justice in violation of 42 U.S.C. § 1983. This Court has subject matter jurisdiction over the Plaintiffs' state law claims based on 28 U.S.C. § 1367, which allows this Court to have supplemental jurisdiction over these claims due to the existence of the two federal claims pled herein.

7. This Court has personal jurisdiction over Lewis under D.C. Code § 13-422 by virtue of the fact that she is a D.C. resident and transacted business with McMahon when she went to his office to negotiate and sign a contract to be Tomasello's local counsel.

8. This Court can assert personal jurisdiction over Greenzweig under D.C.'s long-arm statute (D.C. Code § 13-423) because she transacted business in this jurisdiction by calling McMahon's law firm multiple times, sending faxes to his office to propose court dates, and filing a bar complaint against him in this jurisdiction.

9. This Court can also assert personal jurisdiction over Reilly under D.C.'s long-arm statute based on his transacting of business in this jurisdiction. Based upon information and belief, Reilly has visited this jurisdiction on a number of occasions during the last twenty (20) years. There are various entities located in Washington D.C. which advocate on behalf of firefighters, *e.g.*, the International Association of Firefighters (1750 New York Avenue, N.W., #300). He has met with officials from these entities, attended seminars sponsored by different fire departments, and learned new technology concerning safety on the job. In addition, he transacted business in this district via his attorney agent, Greenzweig, based on the business she conducted in this jurisdiction.

10. As explained herein, this Court can also invoke the doctrine of civil conspiracy jurisdiction on these facts as explained herein to assert jurisdiction over Reilly and Greenzweig based on the

overt acts committed in this jurisdiction by Lewis and Greenzweig.[1] This jurisdiction recognizes the doctrine of civil conspiracy provided that Plaintiffs have sufficiently pled the existence of a civil conspiracy. Plaintiffs have detailed herein the specific role Defendants each played in the conspiracy as required by *Halberstam v. Welch*.

11. Venue is appropriate in this Court under 28 U.S.C. § 1391 for a number of reasons. First, the Defendants named herein and any witnesses living in Virginia will not be inconvenienced if they have to travel to this jurisdiction and attend court proceedings here. For example, Lewis will not be inconvenienced because she lives in D.C, and D.C. Courts have held, if shown to be necessary, that it would not be an injustice to require out of state defendants to attend court proceedings in this jurisdiction. *See Mandelkorn v. Patrick*, 359 F.Supp. 692, 696 (D.D.C. 1973) (asserting jurisdiction over defendants in New York and in Florida).

12. Second, as this Court knows only too well, courts are loath to disturb the decision of a litigant to choose a particular forum.  Third, this jurisdiction represents the nearest neutral forum available to Plaintiffs to bring this action. As detailed herein, the Fairfax County Attorney's Office wields an enormous amount of influence in the administration of justice in Fairfax County. Evidence thereof is the fact that Greenzweig was able to deceive a Fairfax County Circuit Court judge and convince him to dismiss the *Tomasello* case.

## INVOCATION OF CONSPIRACY JURISDICTION IS APPROPRIATE WITH RESPECT TO GREENZWEIG AND REILLY

13. Conspiracy jurisdiction has been held to exist when a conspirator enters the forum and is "deemed to [have] transact[ed] business there directly; [other] co-conspirators who never enter the forum are deemed to [have] transact[ed] business there by an agent." *Second Amendment*

---

[1] In the event that this Court concludes that it does not have *in personam* jurisdiction, nor civil conspiracy jurisdiction over Reilly or Greenzweig, the Plaintiffs would request sixty (60) days in which to conduct jurisdictional discovery with respect to the activities engaged in by each of these Defendants in this jurisdiction independent of the conspiracy jurisdiction doctrine.

*Found. v. United States Conf. of Mayors*, 274 F. 3d 521, 523 (D.C. Cir. 2001) (internal

quotations omitted). For example, Greenzweig, Reilly's agent and attorney, called Tomasello's

law firm on two occasions to threaten McMahon's associate and himself with sanctions and a

bar complaint. Those two acts constitute doing business in this jurisdiction. Therefore, even if

Reilly had never physically entered this jurisdiction, he could be named as a defendant in this

case based on the doctrine of civil conspiracy jurisdiction.

14. "To prevail on its (conspiracy) jurisdictional theory, therefore, [a plaintiff] must make prima

facie showing of a civil conspiracy." *Id* at 524. The case of *Halberstam v. Welch* lays out the

elements of a civil conspiracy cause of action. *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir.

1983). As articulated in that case, the elements for a civil conspiracy are as follows: (1) an

agreement between two or more persons (Defendants named herein agreed to obstruct justice);

(2) to participate in an unlawful act (obstruct justice and unlawfully dismiss the *Tomasello*

case); (3) an injury occurred to the plaintiff (dismissal of the *Tomasello* case) caused by an

unlawful overt act (threatening three separate local counsel with a sanctions motion and

possible bar complaint) performed by one of the parties to the agreement (Greenzweig); (4)

which overt act was done pursuant to and in furtherance of the common scheme (she did that

to secure dismissal of the *Tomasello* case).

15. As detailed herein, Tomasello has pled all of the necessary allegations here, i.e., all Defendants

conspired to obstruct justice in the *Tomasello* case to secure its dismissal and Plaintiffs have

specifically alleged what role each Defendant played in the conspiracy. Therefore, it is

appropriate for this Court to invoke the conspiracy jurisdiction doctrine against Greenzweig

and Reilly.

16. It is a bedrock principle of American law that to be a member of a conspiracy, one need not

know all the other participants in the conspiracy, or even share the same goals. Co-conspirators

need only share an unlawful aim. In this case, the unlawful aim was to obstruct justice and secure dismissal of the *Tomasello* complaint. The Defendants accomplished this by maliciously interfering in the Plaintiffs' contract with Lewis (McMahon's third local counsel) and making sure she had agreed to abandon her role as local counsel in the *Tomasello* case. Greenzweig and Reilly knew that, if Lewis abandoned the case, that abandonment would necessarily result in dismissal of the case.

17. Co-conspirators are partners in crime (*see* 42 U.S.C. § 1985) and are responsible for the reasonable and foreseeable actions of other parties to the conspiracy taken in furtherance of the unlawful aim of the conspiracy. For example, Reilly knew what the result would be if Greenzweig threatened Lewis with sanctions and a bar complaint, as she had threatened McMahon's two prior local counsels. It would result in Lewis abandoning the case, which would result in having the case be dismissed.

## THE PATTERN OF OVERT ACTS ENGAGED IN BY GREENZWEIG AND LEWIS IN SUPPORT OF THE CIVIL CONSPIRACY ALLEGED HEREIN

18. As already alleged herein, Tomasello is claiming that Defendants engaged in a civil conspiracy to deprive her of basic civil rights in violation of 42 U.S.C. § 1983, *i.e.*, the right to prosecute a viable civil action in Fairfax County Circuit Court. Plaintiffs have thus met the pleading requirements set forth in *Halberstam v. Welch* to establish a civil conspiracy. (*See* ¶ 13, *supra*).

19. As shown herein, the civil conspiracy started shortly after the *Tomasello* lawsuit was filed in Fairfax County Circuit Court in the Spring of 2016. That is when Greenzweig and Reilly met to discuss the *Tomasello* case and the demurrer that Greenzweig would be ultimately filing in the case. Greenzweig explained to her client (Reilly) why the *Tomasello* case could set dangerous precedent, *i.e.*, fire chiefs could be sued by line officers for various torts.

20. She was correct in that assessment because Judge Kassabian made that precise ruling in January 2017. When Reilly asked Greenzweig what would happen if the court denied the

County's demurrer, she told him that the only way she could guarantee dismissal of the case was by threatening McMahon's local counsel (Attorney Jameson Fox ("Fox")) with sanctions and a possible bar complaint. She also told Reilly that if Fox was sufficiently intimidated, he would dismiss the case on his own. The reason he could do this is because he was the Virginia attorney who filed the lawsuit, not McMahon who was not admitted to practice in Virginia.

21. To test that possibility and consistent with the promise made to Reilly, Greenzweig placed a long telephone call into McMahon's law firm in Washington, D.C., to speak with Fox, whom she knew to be the only Virginia-barred associate in McMahon's law firm. This was the first overt act engaged in by Greenzweig in this jurisdiction to advance the aforementioned civil conspiracy. She threatened Fox and told him that unless he dismissed the case immediately, that she would file a motion for sanctions and a bar complaint against him. The reason—he was the Virginia attorney who had filed the complaint, not McMahon.

22. This dual threat had a profound effect on Fox as was obvious when he immediately rushed into McMahon's office, who was his boss, after ending his conversation with Greenzweig. Fox usually called before entering the office, but this time he just burst in and was obviously very upset. He asked his boss if Greenzweig could actually file a bar complaint against him and what impact that would have on his future work opportunities.  McMahon candidly told him, "Yes", she could file a bar complaint against him and because the complainant was with the County Attorney's office, bar counsel would likely treat that complaint with great deference. It was obvious that Fox was quite concerned about these threats re his future livelihood and the answer that McMahon gave him.

23. The next overt act engaged in by Greenzweig in this jurisdiction occurred approximately one week later. She once again called the McMahon's law firm asking for Fox, but since he was unavailable, the managing partner, McMahon, took the call. She repeated her threat of filing a

sanctions motion and stated that she wished, like Fox, that Mr. McMahon was admitted in Virginia so that she could also file a bar complaint against him. McMahon relayed that conversation to Fox and the two separate threats made by Greenzweig.

24. Fox appeared more disturbed than he was after participating in his own conversation with Greenzweig. He once again asked McMahon what adverse effect, if any, this could have on his professional career if Greenzweig filed a bar complaint against him. McMahon told him that the bar complaint would in all likelihood be dismissed even though the complainant was with the Fairfax County Attorney's office. However, that would be something he would likely be explaining for the rest of his professional career because any potential employer would have a reasonable basis to ask him why a bar complaint was filed against him by the County Attorney's Office.

25. The discernible effect of this conspiracy occurred approximately three to four weeks later when, out of the blue, Fox told McMahon that he would be leaving the firm. This was a shock to McMahon because Fox, before the filing of the *Tomasello* case, had participated in his annual performance review and received a substantial raise. During the review, Fox told McMahon that he wanted to remain in the firm for at least a couple more years and perfect his litigation skills.

26. That is why McMahon believed that the two threats made by Greenzweig caused Fox' imminent departure. Greenzweig obviously knew that her threats would intimidate a young attorney right out of law school such as Fox. She threatened him to convince him to dismiss the case, which would make it more difficult for McMahon to secure justice for his client, Tomasello. No local counsel meant no ability to oppose Greenzweig's anticipated demurrer filed on behalf of FCFD.

27. The next overt act by Greenzweig occurred in Virginia approximately four weeks later as a result of McMahon hiring a competent Virginia local counsel named Joshua Erlich ("Erlich"). Erlich was thrilled to be in the case and looked forward to establishing new caselaw precedent in Fairfax County. However, a couple of weeks later, he was threatened by Greenzweig and dropped out of the case as a result, telling McMahon something along the lines, "Martin, you don't practice out here [in Fairfax County.] I can't afford to have an enemy in the County Attorney's office."

28. As a result of Erlich withdrawing from the case, McMahon again had to find new local counsel and found Lewis in early Fall 2016. As a result, another overt act occurred in this jurisdiction, *i.e.*, Lewis came into D.C. to negotiate a contract with McMahon to work on the *Tomasello* case. McMahon informed her that one of the main requirements was that she had to attend all court hearings with McMahon in order to allow him to address the judge even if he was eventually admitted *pro hac vice*. She told him that she understood this condition and agreed to attend all court hearings on behalf of Tomasello. On or about October 11, 2016, Lewis entered her appearance in the case.

29. After they learned that McMahon was able to hire new local counsel, Greenzweig and Reilly conferred again and agreed that once more Greenzweig would have to threaten new local counsel with a bar complaint and a motion for sanctions to ensure dismissal of the case. Greenzweig and Reilly knew that McMahon was now working with his third local counsel and that it would be difficult to secure another replacement given time constraints and the nature of the lawsuit. The lawsuit was unprecedented in Fairfax County because Tomasello was taking on about 14 members of FCFD and Reilly all by herself.

30. A number of seasoned Fairfax County practitioners confirmed that it would be difficult to secure another local counsel. They had in fact warned McMahon that no one sues FCFD, and

especially the Deputy Fire Chief, Reilly. Another problem was that a rumor was spreading in the Fairfax County legal community that McMahon was difficult to work with and therefore he could not retain competent local counsel. That factor alone would deter any local counsel from joining up with McMahon.

31. After agreeing with Reilly to once more employ the bar complaint and sanctions motion strategy, Greenzweig made identical threats when she spoke with Lewis. That conversation was only one of many conversations which were confirmed by time sheets submitted by Lewis to McMahon to justify the amount of her professional billing statement. Much to the surprise of McMahon, she informed him in an email regarding her statement for work done on the case, that she had exchanged approximately 80 emails with Greenzweig over the course of her roughly three-month representation of Tomasello. That extraordinary number of emails convinced McMahon that Lewis was not just talking with Greenzweig to set dates for oral argument but was conferring with her to coordinate the dismissal of the *Tomasello* case.

32. Instead of requiring Lewis, at that time, to simply drop out of the case like she did with the other two local counsels, Greenzweig convinced her to stay in the case and join the conspiracy. Greenzweig gave Lewis two duties to perform so that the conspiracy would be successful. First, Lewis would keep Greenzweig informed about her schedule and the dates she would not be available for oral argument. She agreed to do this without informing McMahon so he would not know she would not be appearing at important court dates. Knowing Lewis' schedule, Greenzweig was able to send faxes into McMahon's office numerous times, which constituted additional overt acts in furtherance of the conspiracy. She was seeking his confirmation about particular dates when she knew that Lewis would not be present in court in order to secure dismissal of the *Tomasello* Complaint.

33. The transmissions of those faxes (approximately 12) were important overt acts because they misled McMahon into thinking that Lewis had already agreed to those dates and would be available to attend important hearings coming up in the case. McMahon naively consented to the dates requested by Greenzweig to schedule upcoming important hearings not knowing that Lewis had already informed Greenzweig that she would not be available on those dates.

34. The second duty that Lewis agreed to perform was to mislead McMahon about the status of his *pro hac vice* admission. Evidence indicating her intent to mislead McMahon can be found in an email she sent to him on January 4, 2017. She stated therein that she had spoken to the Circuit Court's clerk, who had told her that he was admitted *pro hac vice*. That turned out to be a misrepresentation on her part. Greenzweig and Reilly, however, knew that he had not been admitted *pro hac vice*.

35. Consistent with the promise she made to Greenzweig, she did not appear at a critical hearing for oral argument on January 20, 2017. Her failure to appear prevented McMahon from speaking to the Court and opposing the County's demurrer even though he had stated to the Court that he was admitted *pro hac vice*.[2] Notwithstanding a lack of opposition except as provided in Tomasello's written Opposition to the demurrer, Judge Kassabian allowed two of Tomasello's claims to move forward based on the detailed allegations made in her amended complaint. That is only one indication that Tomasello's lawsuit had substantive merit.

36. As additional evidence of the existence of the civil conspiracy to have the *Tomasello* case dismissed, McMahon heard Reilly say to Greenzweig upon leaving the courtroom, "What are we going to do about that prick [, Mr. McMahon]?" Upon receiving a copy of Greenzweig's

---

[2] As alluded to in the previous paragraph, this statement ended up not being true, however, as Greenzweig proclaimed in open court that McMahon had been lying and misinforming the Court about his *pro hac vice* status. This was due to her knowledge of the situation and the conspiracy that existed between her, Reilly and Lewis. Of course, McMahon had no reason to know this as he relied upon Lewis' statement that he had been admitted.

bar complaint filed against him in the District of Columbia (another overt act which occurred in this jurisdiction), McMahon realized the significance of Reilly's remark.

37. Greenzweig's threats constituted classic unethical conduct, which violated the oath of office she took upon becoming a member of the Fairfax County Attorney's office and the oath she took when she was admitted to the Virginia bar. The threats had the desired result once again because shortly after defeating the County's demurrer, Lewis informed McMahon that she could no longer serve as local counsel. She came up with the excuse that the case was too time consuming, which was a complete fabrication. She had only attended two court appearances and did not write any legal memoranda. Any substantive legal work had been performed by McMahon's law firm.

38. As a result of Lewis dropping out of the case on such short notice, McMahon could not file a timely response to Greenzweig's Motion for Reconsideration of Judge Kassabian's favorable January 20, 2017 decision. Therefore, on February 6, 2017, Judge Kassabian granted the County's motion to reconsider and reversed his earlier decision in favor of Tomasello. He eventually dismissed Tomasello's case with prejudice when Lewis once more did not show up at the second crucial hearing even though he had specifically ordered her to appear.

39. As a direct result of Greenzweig's and Reilly's malicious and intentional interference in the contractual relationship that both Plaintiffs had with local counsel, *i.e.*, Lewis, Tomasello now has no remedy to pursue in Fairfax County. What was particularly distressing to Tomasello is that Judge Kassabian had denied the County's demurrer and had opined that her complaint had sufficient merit to warrant denial of FCFD's renewed demurrer filed by Greenzweig.

40. The next overt act occurred in this jurisdiction when Greenzweig filed a D.C. bar complaint against McMahon. The D.C. bar has not yet ruled on the merits of her bar complaint.

41. As has been shown herein, a total of at least five (5) significant overt acts have occurred in this jurisdiction in furtherance of the civil conspiracy, even if each fax transmission is not treated as a separate overt act. Therefore, Tomasello has satisfied her burden to afford this Court a basis to invoke the doctrine of civil conspiracy jurisdiction.

## RELEVANT STATUTES AND REGULATIONS[3]

42. <u>42 U.S. Code § 1983</u> Civil Action for Deprivation of Rights:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

43. <u>42 U.S. Code §1985</u> Conspiracy to Interfere with Civil Rights:

> <u>Section (2) Obstructing Justice; Intimidating Party, Witness, or Juror</u>: "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court;...*or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory*, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws..."

44. <u>Va. Code Ann. §18.2-460 A</u>: "*If any person without just cause knowingly obstructs a judge,* magistrate, justice, juror, attorney for the Commonwealth, witness, any law-enforcement

---

[3] Emphasis added where words are italicized below.

officer, *in the performance of his duties* as such...*he shall be guilty of a Class 1 misdemeanor*." Defendants knowingly obstructed Judge Kassabian in the performance of numerous duties he had in the *Tomasello* case by *inter alia* ensuring that he would never hear any arguments made by her attorney.

45. One of the duties that Judge Kassabian was unable to perform because of the criminal conduct engaged in by these Defendants was to provide all parties the opportunity to argue their case and treat them fairly at all times. Tomasello was denied the opportunity to have her case heard and, as a result, she was not treated fairly by Judge Kassabian, who had no idea what the conspirators were up to. In addition, her attorney was denied the opportunity to explain to Judge Kassabian the unethical and criminal conduct which Defendants had engaged in.

46. <u>Virginia Supreme Court Rule 4:15. Motions practice</u>: Court Rule 4:15 (b) clearly states in relevant part that "Counsel of record shall make a reasonable effort to confer before giving notice of a motion to resolve the subject of the motion and to determine a *<u>mutually agreeable hearing date and time</u>*." In *Tomasello*, Greenzweig specifically scheduled two crucial motion hearings on dates when she knew Lewis counsel would not be present in violation of this rule. The reason she knew local counsel would not be present is because she had specifically discussed that topic with Lewis, who agreed to abandon the *Tomasello* case and not show up on those dates.

47. That left Tomasello unrepresented by a Virginia licensed attorney at two critical hearings. Greenzweig not only made no effort to comply with this rule, but she specifically ignored the oaths she took when she was admitted to the Virginia Commonwealth bar and when she was sworn in as a member of the Fairfax County Attorney's Office. Instead of upholding the laws of the Commonwealth, her goal was to make sure that Tomasello would not be represented and not have equal access to justice. *See*, *supra*, ¶ 40 (42 U.S.C. § 1985).

16

48. Greenzweig knew based on her years of experience in the Fairfax County Court system that Judge Kassabian would be extremely upset at McMahon if he continued to not have local counsel present in court hearings. That wasted valuable courtroom time, and Greenzweig knew that the judge could grant the County's motion to reconsider his favorable ruling for Tomasello solely based upon the absence of Lewis at court hearings.

49. Virginia Rule of Professional Conduct 3.4(i): A lawyer shall not: "Present or threaten to present criminal or disciplinary charges solely to obtain an advantage in a civil matter." In *Tomasello*, Greenzweig made baseless threats to file sanctions and bar complaints against all three Virginia attorneys who had agreed to represent Tomasello as local counsel. The threat was specific, *i.e.*, if you do not drop out of the case, you will be served with a motion for sanctions and a bar complaint.

50. Even though no sanctions would have been warranted under the circumstances, any attorney in Fairfax County (especially one who is just starting out in her own practice like Lewis) knows how powerful the County Attorney's office is, and therefore would deem the threat to be very credible. Proof thereof is the fact that the McMahon was told on two separate occasions by experienced litigators who regularly practice in Fairfax County that they have no interest in suing FCFD because that would ruin their legal careers. Greenzweig knew that this threat would cause local counsel to leave the case, and therefore Attorney McMahon would have to find a fourth attorney to serve as local counsel.

51. Greenzweig was successful in convincing Lewis to abandon the *Tomasello* case and have the case dismissed. As a result, Reilly no longer questioned her loyalty and professional competency. He had severely criticized her for allowing a new *Tomasello* suit to be filed in state court on her watch after she had secured the dismissal of the *Tomasello* Title VII Complaint in the Eastern District of Virginia.

52. Not only did Greenzweig never file her baseless motion for sanctions (evidencing her malicious intent), but by making these baseless threats of disciplinary sanctions she succeeded in having Tomasello be unrepresented by a local Virginia attorney. She knew that McMahon could not speak on Tomasello's behalf because no Virginia attorney was present with him at these two crucial hearings. Much to the delight of Reilly, who personally observed the proceedings, this infuriated Judge Kassabian.

53. That development pleased Reilly very much, and he congratulated Greenzweig for creating a scenario to justify the filing of a D.C. Bar Complaint against McMahon. As already alleged herein, the filing of that complaint answered the question Reilly had posed to Greenzweig on January 20, 2017, which remark McMahon had overheard evidencing an intent in effect to "kill the messenger."

54. <u>Virginia Rule of Professional Conduct 3.4(j)</u>: Rule 3.4(j) states that a lawyer shall not "File a suit, initiate criminal charges, assert a position, conduct a defense, delay a trial, or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another." In *Tomasello*, Greenzweig specifically scheduled hearings on dates she knew Lewis could not be present in order to maliciously injure them. That of course left Tomasello unrepresented at these hearings. Moreover, these were significant hearings, *i.e.*, the judge was actually deciding whether to have the case go forward or have it dismissed.

55. There is an additional concern about Greenzweig's behavior as a county attorney. Attorneys who are engaged as a prosecutor, such as someone like her in her position as a County Attorney for Fairfax County, have additional responsibilities under Virginia Rule of Professional Conduct Rule 3.8(b) not to take advantage of an unrepresented defendant. Greenzweig knowingly did this by ensuring that Tomasello would be unrepresented during at least two

crucial hearings due to the lack of local counsel being present. Thus, she knowingly took advantage of an unrepresented Plaintiff, Tomasello.

56. Va. Code Ann. § 54.1-3903: Under 54.1-3903, before an attorney may practice in the Commonwealth, "he shall take the oath of fidelity to the Commonwealth, stating that he will honestly demean himself in the practice of law and execute his office of attorney-at-law to the best of his ability." In *Tomasello*, Greenzweig and Lewis each violated their duty of fidelity to the Commonwealth by making sure that a citizen of the Commonwealth (Tomasello) was denied the equal protection of both Virginia and U.S. laws.

## FIRST CAUSE OF ACTION:
## VIOLATION OF 42 U.S.C. § 1983 BY ALL DEFENDANTS FOR DEPRIVING TOMASELLO OF HER RIGHT TO PROSECUTE HER CIVIL ACTION IN VIRGINIA STATE COURT

57. Tomasello hereby repeats and re-alleges paragraphs 1 - 56 as if fully recited herein.

58. For Tomasello to properly plead a claim under 42 U.S.C. § 1983, she must plead facts sufficient to establish that:

      1)  A person acting under color of state law committed a

      2)  Violation of a right secured by the Constitution and laws of the U.S.

*Shume v. Pearson Educ. Inc.*, 306 F. Supp. 3d 117, 125 (D.D.C. 2018) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

59. As alleged herein, Greenzweig is a county attorney within the Fairfax County Attorney's Office and Reilly was, at all relevant times, Deputy Fire Chief of the Fairfax County Fire Department. As such, both are state actors and both are people, not entities, who can be sued under the statute by a citizen like Tomasello if they deny her a fundamental civil right.

60. Furthermore, when they came to an agreement to secure dismissal of the *Tomasello* case, they were acting "under the color of state law". Greenzweig was acting as a Fairfax County Attorney when she threatened McMahon and each of his local counsel with sanctions motions. Reilly

was acting in his role as Deputy Fire Chief of FCFD when he pressured Greenzweig to get the *Tomasello* case dismissed by any means necessary, albeit as a client.

61. By conspiring with Greenzweig and Reilly—two state actors—Lewis, a private individual, qualifies as a person who acted under the color of state law. *See Tower v. Glover*, 467 U.S. 914, 920, 922 (1984) (conspiracy between public defenders and state officials involving intentional misconduct precludes former from having sovereign immunity granted).

62. In addition, as alleged herein, the specific object of the conspiracy was to obstruct justice and secure the dismissal of the *Tomasello* case. Tomasello, as a private individual who had been discriminated against for twenty years (20), *inter alia*, had the right to bring a civil action against her employer, the Deputy Fire Chief, and her colleagues, for damages she has sustained as a result of their tortious behavior. *See*, *e.g.*, U.S. Const. amendments I, XIV. Therefore, she had the right to file and prosecute her action against FCFD and numerous FCFD officials in a Virginia state court without being prevented from doing so because the Defendants named herein obstructed justice in her case.

WHEREFORE, when Greenzweig and Reilly agreed to secure dismissal of the *Tomasello* case and when Lewis joined the conspiracy knowing that that was their strategy, they all acted under the color of state law to deprive Tomasello of her constitutional right to prosecute her civil action. As a result, Tomasello asks this Court to enter a judgment in the sum of $1,000,000, jointly and severally, against all Defendants based upon the conduct they engaged in that violated 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION:**
**CIVIL CONSPIRACY AGAINST ALL DEFENDANTS TO OBSTRUCT**
**JUSTICE IN THE *TOMASELLO* CASE IN VIOLATION OF**
**SECTION (2) OF 42 U.S.C. § 1985**

63. Tomasello hereby repeats and re-alleges paragraphs 1-62 as if fully recited herein and specifically recites the fact that in March 2016, McMahon filed a lawsuit on behalf of Tomasello, who eventually also became Lewis' client.

64. *Greenzweig and Reilly did not want this case to go forward for several reasons*. First, the negative publicity from the case would probably challenge the credibility of Reilly and threaten future employee prospects with FCFD and Fairfax County. Second, the disgusting behavior (*e.g*., sending Tomasello out on fire runs after chemotherapy treatment) that Reilly encouraged his subordinates to engage in would reflect poorly on FCFD's image. Third, this case could set dangerous precedent, *i.e*., line officers like Tomasello could indeed sue the Fire Chief.

65. Thereafter, two developments occurred which concerned Greenzweig and Reilly. Tomasello's case had become front page news in <u>The Washington Post</u> in August 2016. This article also cited the suicide of a young female recruit who had been subject to the same outrageous conduct that Tomasello had to endure, *i.e.* constant sexual harassment, retaliation, and unfair treatment by her colleagues. More importantly, the *Tomasello* case also received extraordinary publicity courtesy of the article. The second development was that a trial date had been set for May 2016.

66. To properly plead a claim under 42 U.S.C. § 1985(2), a plaintiff must allege:

    1)  The existence of a conspiracy between two or more people

    2)  To deter a party, witness, or juror from attending or testifying in any matter pending in any court of the United States,

    3)  Which results in injury to the plaintiff.

*Graves v. U.S.*, 961 F.Supp. 314, 319 (D.D.C. 1997) (citations omitted).

67. As already referenced herein, Tomasello has alleged that Defendants engaged in a conspiracy to dismiss her lawsuit in Fairfax County Circuit Court by obstructing justice.

68. Since the object of that conspiracy was to obstruct justice and dismiss her lawsuit, that fact necessitates the conclusion that Tomasello, a party to the lawsuit, would be precluded from attending or testifying in her civil action. And as Fairfax County Circuit Court is a court within this country, it qualifies as a court of the U.S.

69. Lastly, as a result of Defendants' conspiracy, Tomasello was injured immensely. The dismissal of her lawsuit precluded her from receiving justice and thousands of dollars in damages for the malicious, intentional, and discriminatory acts perpetrated by her colleagues of FCFD. It also precluded her from securing the opportunity to hold FCFD accountable for the injustices committed against her and many other female workers that have worked and continue to work for FCFD.

WHEREFORE, based on the Defendants' successful civil conspiracy to obstruct justice in the *Tomasello* case, and secure dismissal of her meritorious suit, Tomasello hereby requests entry of judgment for $1,000,000, jointly and severally against all Defendants.

## THIRD CAUSE OF ACTION:
## BREACH OF CONTRACT AGAINST LEWIS

70. Tomasello and McMahon hereby repeat and re-allege paragraphs 1-69 as if fully recited herein.

71. In December 2016, after losing two local counsel based on the threats of sanctions made by Greenzweig, McMahon was able to secure the services of Lewis as a third local counsel for the *Tomasello* case. When Lewis came into Washington, D.C. to discuss legal representation of Tomasello, the parties agreed that, *inter alia*, Lewis would ensure that McMahon was admitted *pro hac vice* so that he could sign papers and speak in court with her in attendance. Once admitted *pro hac vice*, with her present, he would become first chair in the case, *i.e.*, lead counsel.

22

72. The *Tomasello* case was the sole reason why McMahon entered into a contract with the new local counsel, Lewis, in the first place. Both contractual parties understood that McMahon was a direct and specific third-party beneficiary under their contract. McMahon had explained to Lewis, much like he had explained to prior local counsel, that she would be working for the client, Tomasello, even though local counsel had contracted with him.

73. On or around January 4, 2017, Lewis, consistent with the conspiracy pled herein, emailed McMahon and intentionally misinformed him when she said that he had been admitted *pro hac vice*. Relying on her statement that he had been admitted, McMahon understood he could attend and speak at court hearings expecting, of course, that Lewis would be in attendance. At all relevant times, the Defendants knew that Lewis owed a duty to appear with McMahon and represent Tomasello's interests at all times because she was their joint client.

74. After the date of that exchange, there were two important hearings that came up in the case, *i.e.*, the hearings regarding the refiling of the County's demurrer and the County's frivolous motion for reconsideration of Judge Kassabian's earlier favorable ruling on behalf of Tomasello regarding the renewed demurrer.

75. On both occasions, Lewis never showed up and thus breached the terms of her contract with Plaintiffs. Her reckless conduct resulted in the dismissal of the case. As a result of Lewis' breach of contract, the case was dismissed even though Tomasello had initially prevailed on the demurrer filed by the County.

76. As previously alleged, based on the terms of the contract, Lewis had agreed to secure the admission of McMahon on a *pro hac vice* basis. She failed to do so and actually informed him that he had been admitted on a *pro hac vice* basis when this was not the case. This proved to be very embarrassing because he repeatedly represented to the Court that he had indeed been

admitted *pro hac vice*. That misrepresentation and the repeated failure of McMahon to have Virginia counsel with him resulted in the dismissal of the lawsuit.

WHEREFORE, Tomasello seeks entry of judgment against Lewis based on the fact that Tomasello was her client and she was a distinct third-party beneficiary under the contract she had entered into with McMahon. She seeks a judgment in the amount of $1,000,000 because Lewis breached the terms and conditions of the contract she had entered into with McMahon to represent Tomasello's interests at all times to the best of her ability. And because McMahon was actually a party to the contract, he also seeks entry of judgment against Lewis in the sum of $100,000. Besides breaching the express terms and conditions of their contract, Lewis also breached the implied covenant of good faith and fair dealing, which is part of every D.C. contract.

### FOURTH CAUSE OF ACTION: NEGLIGENCE AGAINST LEWIS

77. Tomasello hereby repeats and re-alleges paragraphs 1 - 76 as if fully recited herein.

78. Lewis, as already alleged herein, entered into a contract to represent Tomasello as her local counsel. As a result, she agreed, *inter alia*, to appear at all hearings with McMahon in order to allow him to address the judge as is required by Virginia *pro hac vice* rules.

79. She not only had a duty to McMahon under the terms of that contract, but she also had a duty to exercise due care in terms of representing Tomasello to the best of her ability. Tomasello was the intended and specific third-party beneficiary of that contract, as Lewis acknowledged in conversations with McMahon, *e.g.*, "Martin, I'm here to help Ms. Tomasello secure justice." This is because the contract was formally executed by Lewis and McMahon, but the contract was entered into for the specific benefit of Tomasello. The contractual parties contemplated that Lewis would perform various legal services in order to represent Tomasello's interests to the best of her ability. For example, a trial date had been set in the case and she was expected to be in attendance.

24

80. Lewis failed to attend court hearings and literally dropped out of the case *sub silencio*, i.e., she never filed a motion to withdraw as is required under Virginia procedural rules. As a result, Lewis breached her duty owed to Tomasello. She failed to complete her performance of the contract by not satisfying at least two conditions: a) seeing the case through to the end which she had agreed to do, and b) appearing in court whenever there was a hearing. She also failed to file a motion to withdraw which would have indicated to McMahon that he had to hire new local counsel.

81. By breaching her duty to represent Tomasello to the best of her ability, Lewis caused her to suffer extraordinary damages, *i.e.*, dismissal with prejudice of the lawsuit. Lewis breached her duty to Tomasello to represent her to the best of her ability by not appearing at the hearing for oral argument on FCFD's motion for reconsideration of Judge Kassabian's decision to allow two of Tomasello's claims to proceed. McMahon, without Lewis being present, could not oppose that motion because he could not speak in court without her being present. His inability to speak left Tomasello completely defenseless and her case was dismissed with prejudice.

82. Because McMahon could not and did not oppose the motion, Judge Kassabian had no choice but to simply reverse his earlier favorable decision to deny the County's demurrer on two counts. Hence, because Lewis failed to appear and thus failed to represent Tomasello to the best of her ability as local counsel, Tomasello's case was dismissed with prejudice and she no longer has a viable remedy to pursue in Fairfax County.

WHEREFORE, Tomasello seeks an entry of judgment against Lewis in the amount of $1,000,000 based on her negligence in failing to perform the duties specified in the aforementioned contract and those duties required of local counsel under VA bar rules.

**FIFTH CAUSE OF ACTION:**
**MALICIOUS INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
**AGAINST GREENZWEIG AND REILLY**

83. Tomasello hereby repeats and re-allege paragraphs 1-82 as if fully recited herein.

84. As alleged herein, a contractual relationship existed between Tomasello and Lewis, which required Lewis to serve as the Plaintiffs' local counsel in the *Tomasello* case.

85. At all relevant times herein, Greenzweig and Reilly knew that Lewis had signed a contract to act as her local counsel in the *Tomasello* case and represent her interests to the best of her ability.   Greenzweig and Reilly both knew the responsibilities that Lewis had under that contract, including: a) to secure the granting of McMahon's *pro hac vice* motion for Court appearances; b) to represent Tomasello by accompanying her attorney when motions to dismiss (*i.e.*, demurrers) were being heard; and c) to confer with Greenzweig regarding setting down agreeable court dates to argue demurrers and other matters.

86. In relation to how the Defendants interfered in the Plaintiffs' contract with Lewis, Greenzweig was able to convince Tomasello's first two local counsel to drop out of the case, as alleged herein, by threatening motions for sanctions and bar complaints. In addition, after the County lost the renewed demurrer that Greenzweig had filed, McMahon observed that both Greenzweig and Reilly were quite visibly upset when they exited the courtroom on January 20, 2017. He also observed them having heated discussions in the hallway. McMahon surmised that Greenzweig knew that she had to figure out a way to calm down Reilly and convince him that she had the situation under control.

87. In order to satisfy Reilly's demands, Greenzweig still had to find a way to get rid of the *Tomasello* lawsuit. Reilly was continuously asking Greenzweig why she had not nailed down the dismissal of all of Tomasello's claims in the Title VII lawsuit filed in the Eastern District

of Virginia which had previously been dismissed. She perceived this to be a slap in the face and that gave her further incentive to obstruct justice in the *Tomasello* case.

88. Greenzweig was concerned that her professional competence was being called into question by Reilly, who wielded significant influence in the Fairfax County Government. She was also concerned because a tentative trial date had been set in the case for May 2017 and because McMahon had already requested deposition dates for Reilly, which made him really upset. The only solution in her mind was to convince Lewis to abandon the *Tomasello* case, knowing that it would be very difficult for Plaintiffs to secure a fourth local counsel. She was successful in that endeavor because Lewis (out of the blue) informed McMahon that she was withdrawing from the case.

89. What was so perplexing to McMahon was that, after defeating the County's original demurrer, Lewis was extremely positive about the case. In fact, she told McMahon that she was "thrilled to be working on the case," and that she liked the fact that her name was now listed on his letterhead.  She even wanted to work with him on new cases that were to be filed against FCFD on behalf of other female fire fighters who had been victims of discrimination, hostile work environment, daily harassment, and threats of sexual assaults on the job. That strong desire to continue working with McMahon disappeared immediately once Greenzweig had threatened her with sanctions and a bar complaint.

90. Based on the agreement she had with Greenzweig, Lewis did not show up at the next two hearings and McMahon was forced to appear with no Virginia attorney present. Greenzweig knew that this would occur and had invited Reilly to be in attendance to witness McMahon being humiliated because once more Lewis never showed up. Neither Judge Kassabian nor McMahon knew that Greenzweig had selected these particular court dates because she knew it would be impossible for Lewis to be in court on those dates.

91. Greenzweig and Reilly were successful in terms of intentionally and maliciously interfering with the Plaintiffs' contract with Lewis because they pressured Lewis into not performing her duties under the contract and they secured the dismissal of the *Tomasello* case as a result. But for Greenzweig's and Reilly's intentional and malicious interference in the contractual relationship that Tomasello had with Lewis, that contractual relationship would still have been in effect. And, based on Judge Kassabian's ruling, the *Tomasello* suit would have proceeded to trial. In fact, based on the Fairfax County trial calendar, the trial in the *Tomasello* case would have taken place in May of 2017.

92. As a result of the Defendants' interference with the Plaintiffs' contractual relationship with Lewis that resulted in the dismissal of the *Tomasello* case, Tomasello suffered significant damages. She lost her ability to seek justice for the discriminatory treatment she faced by her colleagues in FCFD and therefore lost out on hundreds of thousands of dollars in damages had her case been allowed to move forward.

WHEREFORE, as a direct result of Greenzweig's and Reilly's malicious intentional interference in the contractual relationship that the Plaintiffs had with Lewis, and because Tomasello is a specific and direct third-party beneficiary under that contract, judgment is hereby requested to be entered against Greenzweig and Reilly, jointly and severally, in the sum of $1,000,000 in favor of Tomasello.

## SIXTH CAUSE OF ACTION
## LEGAL MALPRACTICE AGAINST LEWIS

93. Tomasello hereby repeats and re-allege paragraphs 1-92 as if fully recited herein.

94. Tomasello retained Lewis to represent her in the *Tomasello* case.

95. Lewis breached the applicable standard of care, *inter alia*, by maliciously, intentionally, and willfully: 1) conspiring with Greenzweig and Reilly to sabotage her client's case by not

securing the granting of McMahon's *pro hac vice* motion, and 2) not appearing at a hearing on a dispositive motion.

96. As a direct and proximate result of Lewis' malicious, intentional and willful legal malpractice, the *Tomasello* case was dismissed by Judge Kassabian, and Lewis suffered financial damages and pain and suffering.

WHEREFORE, Tomasello seeks an entry of judgment against Lewis in the amount of $1,000,000 based on her legal malpractice in causing dismissal of the *Tomasello* case.

## PUNITIVE DAMAGES

Tomasello also requests that, at the appropriate time, the court consider instructing the jury about an award of punitive damages in light of the malicious, willful, voluntary, unethical and criminal conduct engaged in by Defendants. As alleged herein, they violated at least three separate criminal statues—two federal, one state—and numerous Virginia bar rules.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all counts triable by a jury.

Respectfully submitted,

_____/s/_____
Mark G. Chalpin, Esq.
(DC Bar #366794)
116 Billingsgate Lane
Gaithersburg, MD 20877
Tel: (301) 990-4900
Fax: (832) 201-7392
mark.chalpin@gmail.com
*Counsel for Plaintiffs*