**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PATRICIA TOMASELLO, et al.** | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Case No. 1:19-cv-00384 (KBJ) |
| | : | |
| **JAMIE GREENZWEIG, et al.** | : | |
| | : | |
| Defendants | : | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF OPPOSITION TO DEFENDANTS JAMIE GREENZWEIG AND
MICHAEL T. REILLY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

COUNTERSTATEMENT OF FACTS ................................................... 2

ARGUMENT ...................................................................................... 10

I.      Standards of Review ………………………………………………..  10

II.     This Court Can Assert Specific Personal Jurisdiction over Greenzweig and
        Reilly, It Can Assert General Personal Jurisdiction over Reilly, and It Can
        Assert Conspiracy Jurisdiction over Greenzweig and Reilly …………………..12

        A.  This Court Can Assert Specific Personal Jurisdiction over Greenzweig
            and Reilly Based on the Overt Acts Committed in the District by Greenzweig 12

        B.  This Court Can Assert Specific Personal Jurisdiction over Reilly Based on
            His Contacts with the District ……………………………………………19

        C.  This Court Can Assert Conspiracy Jurisdiction over Reilly and Greenzweig
            Based on Their Overt Acts Committed in the District ………………………..  22

III.    Venue Is Appropriate in the District of Columbia ……………………………  25

IV.     This Court Has Subject Matter Jurisdiction ……………………………………30

V.      The Complaint States Claims upon Which Relief May Be Granted …………..  32

        A.  The Complaint States Plausible Claims against Reilly ………………………  32

        B.  Count II States a Cause of Action upon Which Relief May Be Granted as
            Plaintiffs Contend that Greenzweig and Reilly's Conspiracy to Obstruct
            *Tomasello II* Was Based on Sex and Race ……………………………………  34

        C.  Count I States a Cause of Action upon Which Relief May Be Granted as
            Plaintiffs Contend that Greenzweig and Reilly's Conspiracy Violated their
            Fourteenth Amendment Right to Substantive Due Process and Greenzweig
            Is Not Entitled to Immunity ……………………………………………..  34

        D.  The Complaint States a Claim upon Which Relief May Be Granted for
            Malicious Intentional Interference with Contractual Relations ………………  38

        E.  *Res Judicata* Does Not Bar the Plaintiffs' Claims ……………………………  39

CONCLUSION ………………………………………………………………………  43

CERTIFICATE OF SERVICE ………………………………………………………..  44

# TABLE OF AUTHORITIES

## CASES

Page

*Asahi Metal Industry Co. v. Superior Court of Cal., Solano City*,
480 U.S. 102, 112 (1987) ………………………………………………………… 11

*Ashcroft v. al-Kidd*, 563 U.S. 731, 725 (2011) ………………………………………… 37

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) …………………………………………… 12

*Athridge v. Aetna Cas. and Sur. Co.*, 604 F.3d 625, 634 (D.C. Cir. 2010) ……………… 40

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) ……………………………… 12

*Bellsouth Intellectual Prop. Corp. v. VCS Techs., Inc.*, No. CIV.A.04-1476 GK,
2004 WL 2475558, at *1 (D.D.C. Oct. 29, 2004) ………………………………………… 25
.
*Bigelow v. Garrett*, 299 F. Supp. 3d 34, 41 (D.D.C. 2018) …………………………… 10, 11

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) …………………………… .18, 19

*Charlton v. Mond*, 987 A.2d 436, 438 (DC 2010) ……………………………………… 15-16, 17

*Cockrell v. Cumberland*, 458 A.2d 716, 717 (DC 1983) ……………………………… 16-17

*Cockrum v. Donald J. Trump for President, Inc.*,
319 F. Supp. 3d 158, 172 (2018)…………………………………………… 10, 11, 22-23, 25

*Collins v. City of Harker Heights, Texas*, 503 U.S. at 129, 112 S.Ct. 1061) ………...…… 36

*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) …………………………… 35, 36

*Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990) ………..……. 10

*Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014) …………………………… 10, 11, 21

*Davani v. Va. Dep't of Transp.*, 434 F.3d 712 (4th Cir. 2006)……………………………..31

*Does 1-144 v. Chiquita Brands Int'l, Inc.*, 285 F. Supp. 3d 228, 233-34 (D.D.C. 2018) ….11

*Dooley v. United Techs. Corp.*, 803 F. Supp. 428, 436-37 (D.D.C. 1992) ……………….. 17

*Duggin v. Adams,* 234 Va. 221, 360 S.E.2d 832, 836 (1987) ……………………………. 38

*Dunlap v. Cotton Transmission Systems, LLC*, 28 Va. 207, 216 (2014) ………………….. 32

Page

*EIG Energy Fund XIV, L.P., v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52
(D.D.C. 2017) ……………………………………………………………………….. 22

*Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403,
372 U.S. App. D.C. 312 (D.C. Cir. 2006) …………………………………………….... 36

*Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)…………………… 31

*FC Investment Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094-95 (D.C. Cir. 2008).. 10

*FC Investment Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 8-9
(D.D.C. 2006) …………………………………………………………... 18-19, 20, 25, 27-30

*Freeman v. Fallin,* 254 F. Supp. 2d 52, 56 (D.D.C. 2003) …………………………………12

*George Washington University v. District of Columbia*, 318 F.3d 203, 209
(D.C. Cir. 2003) ………………………………………………………………………… 36

*Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered,*
935 A.2d 362, 369 (D.C. 2007) ………………………………………………………… 21

*Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 924 (2011) ……….. 11,12

*Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 511 n. 4 (D.C. Cir. 2002) … 20,21, 25

*GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) …….. 10

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) …………………………22,23, 24

*Harris v. Omelon,* 985 A.2d 1103 (D.C. 2009) ……………………………………  14-15, 17

*Hawkins v. Washington Metro. Area Transit Auth.*, 311 F.Supp.3d 94, 100 (D.D.C. 2018) ……… 10

*International Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945) ………………….……. 11

*Jeong Seon Han v. Lynch*, 223 F.Supp.3d 95, 103 (D.D.C. 2016) ………………….……… 10

*Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 54-55 (D.D.C. 2016) ………...……… 35

*Kush v. Rutledge*, 460 U.S. 719, 725-726 (1983) …………………………………….… 34

*Lane v. Franks*, 573 U.S. 228, 242 (2014) …………………………………………….... 36

*Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 302-03
(D.D.C. 2011) ………………………………………………………………… 39-40, 41

Page

*Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982) ...................... 38

*Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) ......................................... 21

*Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657, 662 (1984) ................................... 38

*Moore v. Idealease of Wilmington*, 465 F. Supp. 2d 484, 488 (E.D.N.C. 2006) .......... 30, 31

*Nat'l Am. Ins. Co. v. Ruppert Landscape Co.*, 122 F. Supp. 2d 670, 677 ..................... 40

*Okusami v. Psychiatric Institute of Washington, Inc*., 959 F.2d 1062, 1066
(D.C. Cir. 1992) ..................................................................................... 33

*Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984) ..................................... 41

*Paul v. Davis*, 424 U.S. 693 701, 96 S.Ct. 1155, 47  L.Ed. 2d 405 (1976) .................... 35

*Pendleton v. Mukasey*, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) ................................. 12

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993).... 21-22

*Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001) . 23

*Shume v. Pearson Education Inc*., 306 F. Supp. 3d 117, 126 (D.D.C. 2018) ................. 35

*Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997)  ........................ 42

*United States v. Tatum*, 943 F.2d 370, 381 (4th Cir. 1991) ..................................... 41

*Walden v. Fiore,* 571 U.S. 277, 291 (2014) .......................................... 21, 22, 24

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005).................................... 31

*Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) ............................... 35

*Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed. 2d 935 (1974) ........... 35

*Youngberg [v. Romeo]*, 457 U.S. at 319-20, 102 S.Ct. 2452 ................................. 35

## UNITED STATES CONSTITUTION

Fourteenth Amendment to the U.S. Constitution ...................................... 34, 35, 37

Page

## STATUTES

28 U.S.C. § 1391 ……………………………………………………………….. 26

28 U.S.C. § 1391(b)(2) ……………………………………………………… 26, 27

42 U.S.C. § 1983 ……………………………………………………… 32, 33, 35, 37

42 U.S.C. § 1985 ……………………………………………………… 3, 30, 31

42 U.S.C. § 1985(2) ……………………………………………………… 32, 34

D.C. Code § 13-423 ……………………………………………………….. 20

D.C. Code § 13-423(a) ……………………………………………………… 10, 15

D.C. Code § 13-423(a)(1) ……………………………………………….... 11, 16, 17, 25

D.C. Code § 13-423(a)(4) ……………………………………………………… 16

## RULES

Fed. R. Civ. P. 12(b)(1) ……………………………………………………… 2, 10

Fed. R. Civ. P. 12(b)(2) ……………………………………………………… 2, 10

Fed. R. Civ. P. 12(b)(3) ……………………………………………………… 2, 12

Fed. R. Civ. P. 12(b)(6) ………………………………………………..2, 10, 12

SCR Civil 12(b)(2) ……………………………………………………….. 14

## TREATISES

Restatement (Second) of Judgments § 24 (1982) ………………………………………… 42

Restatement (Second) of Torts § 577(1) ………………………………………… 15-16

Wright and Miller's Federal Practice and Procedure § 3806 (1994 Supp.) ………………… 27

Plaintiffs Patricia Tomasello ("Tomasello") and McMahon ("McMahon"), by undersigned counsel, respectfully file their Memorandum of Points and Authorities in Opposition to Defendant Jamie Greenzweig ("Greenzweig") and Michael T. Reilly's ("Reilly") Motion to Dismiss ("Motion to Dismiss") pursuant to Fed. R. Civ. Pro. 12(b)(1), (2), (3) and (6) as follows:

## COUNTERSTATEMENT OF FACTS

Plaintiffs are seeking redress for injuries sustained as a direct result of the criminal conspiracy engaged in by Greenzweig, Defendant Hasina Lewis ("Lewis"), and Reilly to obstruct justice to secure the dismissal of Tomasello's case entitled *Tomasello v. Reilly* ("*Tomasello II*"), which had been filed by McMahon's law firm in Fairfax County Circuit Court ("Circuit Court"). Defendants conspired to obstruct justice by ensuring that no local Virginia-licensed attorney would be present in Circuit Court representing Tomasello to defend against dispositive motions filed by Greenzweig on behalf of the Fairfax County Fire Department ("FCFD"). The goal of the conspiracy was to deprive Tomasello of fundamental due process by ensuring the absence of local counsel at the hearings on dispositive motions so that Tomasello's arguments would not be heard and the dispositive motions would be granted, resulting in dismissal with prejudice of *Tomasello II*.

Greenzweig, in conspiracy with Reilly, scheduled dates for oral argument on dispositive motions (*e.g.*, demurrers), and in setting down a discovery schedule, knowing that Lewis (Tomasello and McMahon's local counsel) would not be present on those dates. Lewis did not appear because Greenzweig had threatened her with a sanctions motion and a possible bar complaint if she did not abandon *Tomasello II*.  Greenzweig had used the same tactic successfully before, in conspiracy with Reilly, to convince Tomasello's two former local counsels to withdraw from *Tomasello II*. As a result of the second unexplained failure to have Lewis present at these hearings and Lewis' sudden withdrawal, *Tomasello* II was dismissed with

prejudice as a direct result of Defendants' successful efforts to obstruct justice in violation of 42 U.S.C. § 1985.

In their Memorandum of Points and Authorities ("Mem. P & A") in support of their Motion to Dismiss, Greenzweig and Reilly mischaracterize Plaintiffs' claims as an attempt to relitigate Tomasello's litigation against FCFD in federal court ("*Tomasello I*"), which alleged Title VII violations, and *Tomasello II*, which alleged conspiracy to terminate her employment, intentional interference with an employment contract, and intentional infliction of emotional distress. Those employment related claims contrast starkly with the claims in the instant case, where Tomasello and McMahon are seeking damages based on Defendants' conspiracy to obstruct justice and, in the process, to secure the dismissal of *Tomasello II*. The Complaint makes clear that Plaintiffs are not asking this Court to overturn the decision made by the courts in *Tomasello I* or *II*.

Tomasello has been employed by FCFD for over 20 years and learned early on how racist the department was, *i.e.*, she was told "the only reason you're here is because you're black and female." *See* Complaint at ¶ 1. She experienced severe work place harassment including: 1) removal from an arson investigation squad for no reason, 2) being ordered out on fire runs while on light duty status and undergoing chemotherapy. *See id.*  Reilly had been trying to run her out of the department ever since she had started working for him. *See id.* at ¶¶ 1, 5. Based on a pretext, he eventually transferred her to a civilian position where she still works at a severely reduced salary with a significant loss of job benefits. *See id.* at ¶ 5.

McMahon and his law firm filed *Tomasello II* in Fairfax County to seek justice for Tomasello after *Tomasello I* had been dismissed in the Eastern District of Virginia. *See id.* at ¶ 2. Lewis contracted with both Tomasello and McMahon to serve as local counsel in *Tomasello II*. *See id.* She then literally abandoned *Tomasello II* in January 2017. *See id.* at ¶ 4. After a series of meetings with Greenzweig, Lewis conspired with Greenzweig and Reilly to obstruct justice and

secure dismissal of *Tomasello II*, in spite of her contractual and ethical obligations to Tomasello and McMahon. *See id*. at ¶¶ 4, 16. Greenzweig and Reilly thereby maliciously interfered in Plaintiffs' contract with Lewis to ensure she abandoned her role as local counsel. *See id*. at ¶ 16. Moreover, not only did Greenzweig and Reilly violate three separate Virginia and federal criminal statutes, but Greenzweig also violated Virginia Bar Rules, as detailed in the Complaint.

Evidencing her malice toward Tomasello, Greenzweig told McMahon that she resented the fact that Tomasello had the nerve to file a second case in state court after dismissal of *Tomasello I*. *See id*. at ¶ 3. Reilly criticized Greenzweig for allowing the initiation of a new state court case, *Tomasello II*, after dismissal of *Tomasello I*. *See id*. Greenzweig explained to Reilly that *Tomasello II* was far more dangerous than *Tomasello I* in that it could set a precedent that fire chiefs could be sued by line officers for various torts. *See id*. at ¶ 19. Her assessment turned out to be correct because Judge Kassabian made that precise ruling in January 2017 when he denied Defendants' demurrer in part.  *See id*. at ¶ 20.

When Reilly asked Greenzweig what would happen if the Court denied FCFD's demurrer, she told him the only way she could guarantee dismissal was by engaging in criminal conduct and threatening Tomasello and McMahon's first local counsel, Jameson Fox, Esq. ("Fox"), who was right out of law school, with sanctions and a possible bar complaint. *See id*. at ¶¶ 20, 26. She advised Reilly that, if Fox were sufficiently intimidated, he could dismiss *Tomasello II* on his own. *See id*. at¶ 20. The reason—Fox could dismiss the case because he was barred in Virginia while McMahon was not. *See id*.

The first overt act engaged in by Greenzweig in the District was to place a long phone call to McMahon's law firm to speak with Fox, whom she knew to be the only Virginia-barred associate in McMahon's law firm. *See id*. at ¶ 21. Greenzweig threatened Fox and told him that, unless he dismissed the *Tomasello* case immediately, she would file a motion for sanctions and a

bar complaint against him as he was the Virginia-barred attorney who had filed the complaint. *See id.*

Greenzweig's dual threat had a profound effect on Fox as he immediately rushed into McMahon's office, who was his boss, after ending his conversation with Greenzweig. *See id.* at ¶ 22. Fox usually called before entering McMahon's office, but this time he just burst in and was obviously very upset. *See id.* He asked McMahon if Greenzweig could actually file a bar complaint against him and what impact a bar complaint would have on his future opportunities. *See id.* McMahon candidly told him that Greenzweig could file a bar complaint against him and that, because she was with the County Attorney's office, bar counsel would likely treat her complaint with great deference. *See id.* It was obvious to McMahon that Fox was quite concerned about Greenzweig's threats to his future livelihood and McMahon's assessment of the threats. *See id.*

Greenzweig's second overt act in the District occurred approximately one week later when she again called McMahon's law firm asking for Fox. *See id.* at ¶ 22. Fox was unavailable, and McMahon took the call. *See id.* Greenzweig repeated her threat of filing a sanctions motion and stated that she wished that McMahon was barred in Virginia so that she could file a bar complaint against him as well. *See id.* When Fox returned to the office, McMahon informed him about his conversation with Greenzweig and the additional, identical threats made by her. *See id.* Fox appeared more disturbed than after his own previous conversation with Greenzweig. *See id.* at ¶ 24. He once again asked McMahon what adverse effect a bar complaint could have on his career. *See id.* McMahon told him that the bar complaint would probably be dismissed even though Greenzweig was with the County Attorney's office. *See id.* However, he told Fox that he would likely be explaining the bar complaint for the rest of his professional career because any potential Virginia employer would have a reasonable basis to ask him why a bar complaint had been filed against him by the Fairfax County Attorney's Office. *See id.*

Sometime after McMahon's conversation with Greenzweig, Fox told McMahon out of the blue that he was leaving the firm. *See id*. at ¶ 25. McMahon was shocked because Fox had participated in his annual performance review and received a substantial raise before filing the *Tomasello* case. *See id*. During the performance review, Fox even told McMahon that he wanted to remain in the firm for at least a couple more years to hone his litigation skills. *See id*.

The third overt act occurred in Virginia approximately four weeks later after McMahon hired a competent Virginia local counsel, Joshua Erlich ("Erlich"). *See id*. at ¶ 27. Erlich was initially thrilled to be working on *Tomasello II*, and he looked forward to establishing new precedent in Fairfax County[1]. *See id*. Then, Greenzweig threatened Erlich as she had with Fox and McMahon, and Erlich wanted nothing to do with *Tomasello II* as a result. *See id*. Erlich later told McMahon, "Martin, you don't practice out here [in Fairfax County.] I can't afford to have an enemy in the County Attorney's Office." *See id*. at ¶ 27.

After Erlich repudiated his oral contract to act as local counsel in *Tomasello II*, Greenzweig and Reilly knew that McMahon would have to find new local counsel (*i.e.*, his third local counsel) and found Lewis in early Fall 2016. *See id*. at ¶ 28. Lewis, who is domiciled in the District of Columbia, came to the District from her Virginia office to negotiate a contract with McMahon to work on the *Tomasello II*. *See id*. at ¶¶ 4, 28. McMahon informed her that one of the main requirements was that she had to attend all hearings with McMahon in order that he could address the Court even if he were eventually admitted *pro hac vice*. *See id*. at ¶ 28. Lewis acknowledged this requirement and what it meant, and agreed to attend all hearings. *See id*. She entered her appearance in the *Tomasello* case on October 11, 2016. *See id*.

Greenzweig and Reilly conferred again and agreed that once more Greenzweig would have to threaten new local counsel, Lewis, with a motion for sanctions and a bar complaint to

---

[1] Erlich had also expressed an interest on working on other cases McMahon had been approached about concerning FCFD.  *See* McMahon Declaration at Exhibit 1 at ¶ 2.

ensure dismissal of the *Tomasello* case. *See id*. at ¶ 29. Greenzweig and Reilly knew that it

would be difficult for McMahon, if not impossible, to secure yet another replacement given time

constraints and the nature of the *Tomasello* case. *See id*. Greenzweig then made the same threats

to Lewis that she had made to Fox, McMahon, and Erlich. *See id*. at ¶ 31. Greenzweig's

conversations with Lewis were confirmed by time sheets submitted by Lewis to McMahon to

justify her billing statement. *See id*. Lewis informed McMahon that she had exchanged

approximately 80 emails with Greenzweig in three months. *See id*. The extraordinary amount of

emails convinced McMahon that Lewis had not just been talking to Greenzweig to set dates for

oral argument and discussing a discovery schedule, but also was obstructing justice by

coordinating dismissal of *Tomasello II* because Greenzweig knew that Lewis would not be

appearing at hearings.  *See id*.

Instead of pushing Lewis to withdraw as she had done with Fox and Erlich, Greenzweig

convinced Lewis to remain in *Tomasello II* and join in with Reilly and her. *See id*.  at ¶ 32.

Greenzweig gave Lewis two duties to secure dismissal. *See id*. First, Lewis would keep

Greenzweig informed about her schedule and the specific dates she would not be available for

oral argument. *See id*. Lewis agreed to do so without informing McMahon so he would not know

she would not be appearing at important court dates. *See id*. Knowing Lewis' schedule,

Greenzweig was able to send approximately 12 faxes to McMahon's office, which constituted

further overt acts committed in the District, seeking McMahon's confirmation about particular

dates when Greenzweig knew Lewis would not be present in court. *See id*. at ¶¶ 32-33. These

faxes misled McMahon into thinking that Lewis had already agreed to the dates suggested by

Greenzweig and that she would be available to attend hearings on those dates consistent with the

representations she made in McMahon's office when she agreed to be local counsel. *See id*. at ¶¶

28, 33. McMahon consented to the dates requested by Greenzweig for upcoming important

hearings not knowing that Lewis had already informed Greenzweig that she would not be available on those dates.  *See id*. at ¶ 33.

The second duty that Lewis agreed to perform was to mislead McMahon about the status of his *pro hac vice* admission. *See id*. at ¶ 34. On January 4, 2017, Lewis emailed McMahon that she had spoken to the Circuit Court clerk, who had told her that McMahon was admitted *pro hac vice*. *See id*. This was a misrepresentation as both Greenzweig and Lewis knew McMahon had had not been admitted *pro hac vice*. *See id*.  The email was also another overt act to obstruct justice, which was committed in the District, *i.e.*, she knew that McMahon would assume he had been admitted and would make representations to Judge Kassabian to that effect. Lewis also knew that Judge Kassabian would be upset to learn that McMahon was misrepresenting his legal status.

Consistent with her agreement with Greenzweig, Lewis did not appear at a critical hearing on January 20, 2017. *See id*. at ¶ 35. Her failure to appear prevented McMahon from speaking to the Court and opposing the County's demurrer even though he had stated to the Court that he was admitted *pro hac vice*. *See id*. Greenzweig then informed the Court that McMahon was lying about his *pro hac vice* status. *See id*. Notwithstanding a lack of opposition except as provided in a written Opposition to the demurrer, Judge Kassabian allowed two of Tomasello's claims to move forward based on the detailed allegations made in her amended complaint. *See id.* While leaving the courtroom that day, McMahon overheard Reilly say to Greenzweig, "What are we going to do about that prick [, McMahon]?" *See id*. at ¶ 36. The only reasonable inference from this question is that Reilly was contemplating that Greenzweig would pursue some other justice obstructing tactic(s) against McMahon. Consistent with that remark, Greenzweig eventually filed a bar complaint against McMahon with the DC Bar Counsel, another overt act occurring in the District, evidencing a criminal intent to obstruct justice. *See id*. at ¶¶ 36, 40.

Shortly thereafter, and out of the blue, Lewis informed McMahon that she could no longer serve as local counsel. *See id*. at ¶ 37.  She did not tell Attorney McMahon that the case did not have merit, but instead told him that *Tomasello II* was too time consuming.  *See id*. This was a complete fabrication as she had only appeared twice in Court and had not written any legal memoranda, as any substantive legal work had been performed by McMahon's law firm. *See id*.

As a result of Lewis' dropping out on short notice, McMahon could not file a timely response to Greenzweig's motion for reconsideration of Judge Kassabian's favorable January 20, 2017 decision. *See id*. at ¶ 38. Seventeen days later, on February 6, 2017, Judge Kassabian granted the motion for reconsideration and reversed his earlier decision in favor of Tomasello. *See id*. The motion for reconsideration that he granted and that Greenzweig had submitted had no new facts for the Court to rely on, nor any new caselaw.  *See* Exhibit 1 at ¶ 3. He eventually dismissed *Tomasello II* with prejudice because McMahon had apparently lied to him and because Lewis once more inexplicably failed to appear at a second crucial hearing, despite the fact that Judge Kassabian had specifically ordered her to appear. *See id*.

As a result of the Defendants' conspiracy to obstruct justice, Judge Kassabian was unable to provide Tomasello the opportunity to argue her case and treat her fairly at all times. *See id*. at ¶ 45. Tomasello was thus denied the opportunity to have her case heard and was not treated fairly by Judge Kassabian, who, like McMahon, had no idea what the conspirators were doing—*i.e.*, obstructing justice. *See id*. Further, McMahon was denied the opportunity to explain to Judge Kassabian the illegal behavior engaged in by the conspirators. *See id*.  To make matters worse, Greenzweig knew based on her years of experience in the Fairfax County court system that Judge Kassabian would be upset at McMahon if he continued not to have Virginia-barred counsel present at hearings and claim that he had properly been admitted *pro hac vice* when in fact he had not. *See id*. at ¶ 48.

**ARGUMENT**

## I.   Standards of Review

A court that is deciding whether a Fed. R. Civ. P. 12(b)(1) motion should be granted "must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F.Supp.3d 94, 100 (D.D.C. 2018) ("*Hawkins*") (quoting *Jeong Seon Han v. Lynch*, 223 F.Supp.3d 95, 103 (D.D.C. 2016) ("*Jeong Seon Han*")) (internal quotation marks and citation omitted). However, a Court should strictly evaluate those allegations as compared to how it accesses the allegations under Rule 12(b)(6). *Hawkins*, 311 F.Supp. at 100 (citing *Jeong Seon Han*, 223 F.Supp. at 103).

As to a Fed. R. Civ. P. 12(b)(2) motion, a plaintiff must establish that a court can properly assert personal jurisdiction when a defendant files a motion to dismiss under that rule. *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 172 (2018) ("*Cockrum*") (citing *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990) ("*Crane*")). If there are any "factual discrepancies" that occur as a result of a plaintiff's attempt to prove jurisdiction, those discrepancies "**must be resolved in favor of the plaintiff**". *Cockrum*, 391 F. Supp., at 172 (citing *Crane*, 894 F.2d, at 456) (emphasis added).

To assert jurisdiction over out-of-state defendants, courts can use specific and/or general personal jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014) ("*Daimler*") (citations omitted); *see Bigelow v. Garrett*, 299 F. Supp. 3d 34, 41 (D.D.C. 2018) ("*Bigelow*"). A court can assert specific jurisdiction over a nonresident defendant if a plaintiff can "establish that specific jurisdiction comports with the forum's long-arm statute, D.C.Code (sic) § 13-423(a), and does not violate due process." *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094-95 (D.C. Cir. 2008) (citing *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000)).

10

Under D.C. Code § 13-423(a)(1), a court can assert jurisdiction if the plaintiff "demonstrate[s] that: (1) the defendant transacted business in the District of Columbia; (2) the claim arose from the business transacted in the District; (3) the defendant had minimum contacts with the District; and (4) the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.' " *Does 1-144 v. Chiquita Brands Int'l, Inc.*, 285 F. Supp. 3d 228, 233-34 (D.D.C. 2018) (citation omitted).

As part of its analysis, a court must determine whether the "defendants' contacts with the forum [are] related to the specific claims raised in plaintiffs' complaint", and a "plaintiff must allege some specific facts evidencing purposeful activity by the defendants in the District of Columbia by which they invoked the benefits and protections of the laws of the District of Columbia", *i.e.*, a plaintiff must satisfy the suit-related conduct standard. *See Cockrum*, 391 F. Supp. 3d at 175 (citation omitted).

In addition, the Supreme Court has acknowledged that specific acts by agents can bind principals for the purposes of specific jurisdiction. *See Daimler*, 571 U.S. at 135, n. 13 ("Agency relationships, we have recognized, may be relevant to the existence of *specific* jurisdiction…. As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take actions there….") (citing to *Asahi Metal Industry Co. v. Superior Court of Cal., Solano City*, 480 U.S. 102, 112 (1987); *International Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945) ("[T]he commission of some single or occasional acts of the corporate agent in a state may sometimes be deemed sufficient to render the corporation liable to suit on related claims") (internal quotation marks omitted).

A court can assert general jurisdiction "based on a forum connection unrelated to the underlying suit". *Bigelow*, 299 F. Supp., at 41; *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile…").

For Fed. R. Civ. P. 12(b)(3) motions, "the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Pendleton v. Mukasey*, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) (citation and internal quotations omitted). "Because it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Freeman v. Fallin*, 254 F. Supp. 2d 52, 56 (D.D.C. 2003).

In regard to Fed. R. Civ. P. 12(b)(6) motions, the Supreme Court has stated: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'…A claim has factual plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Ashcroft*") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). In addition, the Supreme Court has held that "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft*, 556 U.S. at 679.

## II.   This Court can Assert Specific Personal Jurisdiction over Greenzweig and Reilly, it can Assert General Personal Jurisdiction over Reilly, and it can Assert Conspiracy Jurisdiction over Greenzweig and Reilly

### A.   This Court Can Assert Specific Personal Jurisdiction over Greenzweig and Reilly Based on the Overt Acts Committed in the District by Greenzweig

In relation to Greenzweig, Reilly and Greenzweig argue that this Court cannot assert general jurisdiction over her because "she is not domiciled in the District of Columbia..." Mem. P & A at 9. They also argue that it cannot assert specific jurisdiction over her because her "alleged suit-related conduct in the District…fails to demonstrate the minimum contracts required by due process." *Id.* They then state the relevant Plaintiffs' allegations that are used to support the

argument that this court can assert specific personal jurisdiction over the Defendants. *Id.* at 10. To justify their contentions, Defendants cite various Virginia civil procedure rules and rely on those rules to assert that the phone calls and faxes Defendant Greenzweig made and sent to McMahon's law office in the District, respectively, were "mandatory" under those rules, and therefore are "suit-related" in that "they are not in furtherance of the alleged conspiracy to obstruct justice". *Id.* at 10-11.

However, these allegations are clearly suit-related. While the Virginia Rules of Civil Procedure require attorneys to confer with opposing counsel about motions they intend to file, they do not give Virginia attorneys *carte blanche* to obstruct justice. Greenzweig first called into the District to speak with Fox, who had signed the Complaint as the Virginia-barred attorney. *See* Complaint at ¶ 21. During this phone call, she threatened to file a motion for sanctions against him as well as a bar complaint due to the fact that she felt that *Tomasello II* was barred by res judicata, if he did not dismiss the case. *See id.*

However, *Tomasello II* was not an identical lawsuit to *Tomasello I*, and did not plead the same claims or even name the same defendants as in *Tomasello I*, as detailed *supra*. Instead, it named the individual FCFD officials responsible for harming Tomasello, *e.g.*, Reilly, as opposed to just Fairfax County, and brought different causes of action such as conspiracy and intentional infliction of emotional distress, as opposed to just Title VII claims. *See* Defendants' Exhibits 8 and 12 to the Motion to Dismiss.

Not long after that phone call, she again called into the District asking to speak with Mr. Fox, but McMahon spoke with her instead. *See* Complaint at ¶ 23. In this phone call, she reiterated the same threats she made to Fox in her earlier phone call, and also threatened McMahon with the same threats. *See id*. She even stated that she wished he was admitted to the Virginia bar so that she could file a bar complaint against him as well.  *See id.*

In addition, throughout the course of *Tomasello II*, Greenzweig sent approximately 12 faxes to the District regarding the scheduling of dates for court appearances. *See id*. at ¶¶ 32-33. One of the last of these was sent into McMahon's office concerning an important hearing, which Greenzweig knew that Lewis could not attend and yet still let McMahon believe that Lewis would be there, *i.e.,* these were "agreed upon dates". *See id*. at ¶ 33. This fax transmission into the District led McMahon into not having alternative local counsel be present at that hearing. The reason—he assumed Lewis would be there and it was a total surprise to him when she was not. Her lack of an appearance ultimately resulted in *Tomasello II* being dismissed with prejudice, even though Judge Kassabian had, 17 days earlier, denied the FCFD Defendants' identical arguments in their demurrer on two counts.

Lastly, Greenzweig filed a bar complaint against McMahon in the District. *See id*. at ¶ 40. That complaint, along with at least one of the last faxes she sent to McMahon's law office and the threatening phone calls, were all done in furtherance of the conspiracy alleged herein and in conjunction with the conspiracy. As such, they are suit-related conduct for the purposes of resolving the issue of specific jurisdiction. For example, the intent to obstruct justice was obvious, *i.e*., telling McMahon that there were "agreed upon dates" when there were not.

Greenzweig and Reilly's second overall argument concerning this Court's ability to assert specific jurisdiction over Greenzweig is that even if the Court found that the conduct Plaintiffs allege was suit-related, it still "fail[s] to satisfy the due process minimum contacts requirements." Mem. P & A at 11. For this proposition, they cite to several cases (*id.* at 11-12), which are all distinguishable.

One of the cases they rely on is *Harris v. Omelon,* 985 A.2d 1103 (D.C. 2009) ("*Harris*"). *See* Mem. P & A at 11. In *Harris*, the D.C. Court of Appeals affirmed the Superior Court's decision to dismiss the case under SCR Civil 12(b)(2) on the basis that the court lacked personal jurisdiction over the defendant doctor. *Harris*, 985 A.2d at 1104. However, in affirming that decision, the

Court of Appeals found that the plaintiff did not allege any facts that demonstrated that the defendant performed any conduct sufficient to bring him under D.C.'s long-arm statute (D.C. Code §13-423(a)). *Id.* at 1106. The only fact that the Court was made aware of concerning personal jurisdiction was that the defendant doctor had made a single phone call into the District to a pharmacy for the purposes of filling a prescription. *Id.* at 1104, 1106. In rejecting that phone call as a viable basis to assert jurisdiction, the Court of Appeals discussed the fact that the phone call "was made at the request of and for the convenience of the appellant…", which alone would lead to a slippery slope of allowing DC courts to assert jurisdiction over "any doctor who calls in a prescription to a local pharmacy here…for the convenience of a D.C. resident or to assist someone…while visiting here…." *Id.* at 1106-07.

*Harris* can be easily distinguished because it only involves a single inconsequential phone call as a basis for jurisdiction. Here, Plaintiffs allege at least two threatening phone calls were made by Greenzweig into McMahon's law office within the District. *See* Complaint at ¶¶ 21, 23. Moreover, these phone calls were highly consequential to this case in that they were done to obstruct justice in furtherance of the criminal conspiracy alleged herein, *i.e.*, that McMahon's law firm should drop the case or Greenzweig would file sanctions and a bar complaint against Fox. Plaintiffs also allege Greenzweig sent approximately 12 faxes into McMahon's law office, and filed a bar complaint against him in this district. *See id.* at ¶¶ 32-33, 40.

The next case Greenzweig and Reilly rely on came a year later when the D.C. Court of Appeals again affirmed the dismissal of a case on the basis of personal jurisdiction. In *Charlton v. Mond*, 987 A.2d 436, 438 (DC 2010) ("*Charlton*"), the Court had to determine whether alleged defamatory phone calls made into the District by a Maryland resident allowed the lower court to assert jurisdiction under D.C.'s long arm statute. The plaintiff argued that the lower court had jurisdiction over one of the defendants under a theory from the Restatement (Second) of Torts §

577(1), which states that "the situs of the defamation, venue and jurisdiction, is (sic) where the defamatory information was received." *Id.* (internal quotations omitted).

The *Charlton* Court explained that it could not find a case that supported the plaintiff's argument that jurisdiction could be asserted over a defendant just because defamatory information about the plaintiff was received by his associates in the District by phone. *Id.* It then determined that based on plaintiff's claims, he should have tried to argue that the D.C. long-arm statute—specifically, D.C. Code § 13-423(a)(4)—applied to this situation, but then it found that there were not enough contacts to support that theory either. *Id.* at 438-39. In coming to that decision, the *Charlton* Court found that the plaintiff did not allege enough sufficient persistent conduct on the part of the defendant (as required) to justify the lower court being able to rely on § 13-423(a)(4) to assert jurisdiction over him. *Id.* at 439-40.

*Charlton* can also be easily distinguished in that the instant case does not involve a defamation claim or an argument based on D.C. Code § 13-423(a)(4). As alleged in the complaint, this Court can assert jurisdiction over Greenzweig based on D.C. Code § 13-423(a)(1), the "transacting business" provision, based on her threatening phone calls, faxes intended to convince McMahon that proposed court dates for upcoming hearings had already been agreed to by Lewis, and a bar complaint filed in this district. *See* Complaint at ¶ 8.

The last case Greenzweig and Reilly rely on to argue that this Court cannot assert jurisdiction over Greenzweig is another, much older D.C. Court of Appeals case. In *Cockrell v. Cumberland*, 458 A.2d 716, 717 (DC 1983) ("*Cockrell*"), the D.C. Court of Appeals considered whether the Superior Court properly dismissed plaintiff's claims on the basis of personal jurisdiction and *forum non conveniens* against a defendant company which allegedly improperly surveyed the plot of land for the cabin it was going to build for the plaintiff. The plaintiff's alleged bases for the Superior Court to assert jurisdiction were that the company wrote letters and made phone calls to him when they negotiated the contract to build a cabin for him. *Id.*

The *Cockrell* Court stated it would be difficult for it to hold that these bases for jurisdiction constituted "transacting business in the District". *Id.* It went on to explain that D.C. Code § 13-423(a)(1) "embraces those contractual activities of a nonresident defendant which cause a consequence here." *Id.* (internal quotation marks; citations omitted). Using that analysis, the *Cockrell* Court held that "[t]he only consequence [here]… of which appellant complains…is injury to his bank account", due in part to the fact that he paid the surveyor hired by the defendant company who negligently surveyed his property. *Id.* at 718. This was not a consequence according to the *Cockrell* Court because that injury was not the main injury complained of (*i.e.*, the plaintiff's causes of action arose out of the surveyor's negligence and "the resulting construction of the cabin in the wrong place, both of which occurred entirely in Virginia"). *Id.*

Like *Harris* and *Charlton*, *Cockrell* can be distinguished as well because the phone calls plaintiff alleges as giving rise to jurisdiction in the District solely related to the creation of a contract between the parties. *See id.* at 717. Hence, they did not relate to the causes of action themselves because those arose out of the performance of the contract. Here, as already contended *supra*, Plaintiffs are alleging that the phone calls (and faxes and bar complaint) were done in furtherance of the conspiracy and other relevant causes of action herein. *See Dooley v. United Techs. Corp.*, 803 F. Supp. 428, 436-37 (D.D.C. 1992) ("It is fair and reasonable that these defendants be called back into this forum to defend against claims foreseeably stemming from their actions here", and "It is not unreasonable for the Saudi defendants to be called to defend themselves on an action which relates to the conspiracy that they successfully fostered in this forum"). Again, the last fax sent into the District by Greenzweig was intended to obstruct justice and deceive McMahon, so Greenzweig should not find it unreasonable to get called into the District to defend herself.

Greenzweig committed the first two overt acts of the conspiracy to obstruct justice and end *Tomasello II* by deliberately calling into the District to threaten Fox and McMahon to drop the

case in lieu of sanctions and a bar complaint, and therefore, it is reasonable for this Court to assert jurisdiction over her.

In addition to the facts distinguishing the cases Greenzweig and Reilly cite, this Court has also acknowledged the role phone calls and faxes can play in terms of its personal jurisdiction analysis. In *FC Investment Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 8-9 (D.D.C. 2006) ("*FC Investment Group*"), this Court cited an earlier Supreme Court case for the proposition that "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines…." (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)) (internal quotation marks omitted). It then went on to state that:

> Accordingly, it has long been the law that an absence of physical contacts will not defeat personal jurisdiction so long as the defendant's efforts are purposefully directed toward residents of another state. Just as clearly, **transactions by telephone and facsimile alone can, depending on the circumstances, be an adequate basis for personal jurisdiction**. *Id.* at 9 (internal citations omitted) (emphasis added).

The *FC Investment Group* Court then explained that the amount of contacts is not what is important for a court's due process analysis, but rather it is "their significance". *Id.* The facts the Court felt were significant included: 1) around 10 phone calls between the nonresident defendant and resident plaintiff, most of which were initiated by the defendant; 2) the calls were made to the plaintiff's D.C. office "at a number with a 202 [D.C.] area code"; and 3) the defendant sent a fax to the plaintiff's D.C. office where the fax number also contained a 202 area code. *Id.*

The *FC Investment Group* Court found that, based on those facts, the nonresident defendant was on notice that the plaintiff was in the District, that the phone conversations were not merely "happenstance", as the plaintiffs allege that these phone calls were used by the defendant to intentionally defraud the plaintiffs, and that the contacts listed earlier in this paragraph were more "deliberate rather than incidental". *Id.* Therefore, the *FC Investment Group* Court held that the defendants "should have reasonably anticipated having to litigate a matter arising directly from

18

those contacts in this jurisdiction", and that it did not "offend [] traditional notions of fair play and substantial justice" to assert jurisdiction over them. *Id.* at 9, n. 2[2]. As alleged in the Complaint, the conduct engaged in by Greenzweig and her co-conspirators was more "deliberate" than "incidental", and so it will not offend traditional notions of fair play and substantial justice to bring her to justice here.

The facts here are closely analogous to the facts this Court looked favorably upon in *FC Investment Group*. Plaintiffs are alleging that phone calls (2), faxes (12), an email and a bar complaint were used to further a conspiracy just like the plaintiffs alleged in that case. *See FC Investment Group*, 441 F. Supp. at 9. Also, McMahon's office has a 202 number for both its telephone line and its fax line, so it is impossible for Greenzweig to claim that she was not on notice that McMahon's office was located in the District. *See id.* Moreover, Greenzweig intentionally, at the behest of Reilly and with his approval, called into the District to threaten Fox and McMahon on two separate occasions, and also sent faxes into McMahon's office to mislead him into thinking Lewis could attend upcoming court dates. Obviously, then, they were deliberate acts made in furtherance of the conspiracy to obstruct justice alleged herein.

**B. This Court Can Assert Specific Personal Jurisdiction over Reilly Based on His Contacts with the District**

Regarding Reilly, Greenzweig and he contend that this Court cannot assert personal jurisdiction over him under an agency theory or conspiratorial jurisdiction theory[3] for several reasons. First, they argue that the threatening phone calls and faxes Greenzweig made or sent

---

[2] Of particular relevance to the instant case, the *FC Investment Group* Court also explained in footnote 2 of its opinion that D.C. had a "strong" interest in adjudicating the claims at issue in that case even though they were brought by a Maryland resident (a company). Also, it stated that a D.C. court could decide the dispute at issue there as it would be "efficient and interfere[d] with no fundamental substantive social policy", citing to *Burger King* (471 U.S. at 477) (quotation omitted). Here, the Court should rule similarly and rule that it has jurisdiction over all Defendants, even though one of the plaintiffs lives in Virginia.
[3] Plaintiffs will address their argument as to why this Court can assert conspiratorial jurisdiction over Greenzweig and Reilly in the next section of the Argument *infra*.

into the District "is not permitted under D.C. Code § 13-423 and does not comport with due process." Mem. P & A at 13. Next, they argue that this Court cannot consider Lewis' pre-conspiratorial actions in the District as part of its jurisdictional analysis. *Id.*

The obvious problem is that Greenzweig and Reilly do not cite to any case law for the proposition they are proffering, *i.e.*, that phone calls and faxes into this jurisdiction cannot be used as a basis for this Court to assert jurisdiction over them. Assuming they will rely on the same cases they used in their previous section *supra* regarding Greenzweig's lack of contacts to make this argument in their Reply, Plaintiffs have already distinguished those cases in that section *supra* and those distinguishing factors would apply similarly if Greenzweig and Reilly try to apply them to Reilly (*e.g.*, the phone calls and faxes Greenzweig prepared and then sent, respectively, into the District were made in furtherance of the conspiracy to obstruct justice as alleged herein, not for an ancillary matter).

Additionally, Plaintiffs have found at least two cases that recognize that phone calls and faxes can be used by courts to assert jurisdiction over nonresident defendants. As set forth *supra*, the *FC Investment Group* Court stated, *inter alia*, that "telephone and facsimile alone can… be an adequate basis for jurisdiction." *FC Investment Group*, 441 F.Supp.2d at 9 (citing to *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 511 n. 4 (D.C. Cir. 2002) ("*Gorman*")). Based on that case, and the D.C. Circuit case it cites to (*Gorman*), this Court would thus simply be relying on apposite caselaw by deciding to assert jurisdiction over Reilly and denying the Motion to Dismiss.

Greenzweig and Reilly's last two arguments in regard to the two theories mentioned *supra* are that Reilly never committed "any purposeful actions to avail himself of the jurisdiction of this court", which they contend cannot be reconciled with the concept of "fair play and substantial justice", and that Plaintiffs make no allegations in their Complaint that Reilly was aware what his co-conspirators (Greenzweig and Lewis) were doing in the District to further the conspiracy to obstruct justice alleged herein. Mem. P & A at 13. In rounding out their arguments, they then

20

acknowledge that D.C.'s long-arm statute allows courts in this judicial district to assert personal jurisdiction over a nonresident defendant under an agency theory, while citing to *Walden v. Fiore,* 571 U.S. 277, 291 (2014) ("*Walden*"), for the proposition that the Plaintiffs have to allege that Reilly (as opposed to they themselves) has sufficient minimum contacts with the forum to enable this Court to assert jurisdiction over him. *Id.* at 13-14.

As discussed in footnote 3, Plaintiffs will address their conspiracy jurisdiction arguments in the next section *infra*. However, Greenzweig and Reilly's arguments can also be disposed of on an agency theory of jurisdiction. The Supreme Court in *Daimler,* 571 U.S. at 135, acknowledged that courts can assert specific jurisdiction over nonresident defendants under an agency theory (("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there") (internal citations omitted)).

While *Daimler* concerned the corporate context, it is reasonable and appropriate for this Court to assert jurisdiction over an individual client whose attorney-agent acts to further a conspiracy in this judicial district. Plaintiffs assert that Reilly specifically directed Greenzweig to essentially do whatever was necessary to dismiss *Tomasello II* (*see* Complaint at ¶¶ 29, 36), including discrediting McMahon in front of Judge Kassabian in any way possible. This Court should therefore be allowed to assert jurisdiction over Reilly on an express agency theory. However, even if Reilly did not specifically direct Greenzweig to make threatening phone calls, send misleading faxes, or file a bar complaint in the District, he should be liable to suit in this judicial district based on the acts of his attorney and agent, Greenzweig, who had the actual and/or apparent authority to act on his behalf, *i.e.,* "What do we do about this prick?". *See Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*, 935 A.2d 362, 369 (D.C. 2007) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) ("Fischer is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (internal quotation marks and citation omitted); *see also Pioneer Inv. Servs.*

*Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993) ("[W]e have held that clients must be held accountable for the acts and omissions of their attorneys").

Lastly, Greenzweig and Reilly use *Daimler* to argue that this Court does not have general jurisdiction over Reilly because the various annual meetings and seminars held in the District that he attends, based on information and belief, are not sufficient under a "continuous and systematic" analysis. Mem. P & A at 14. In the interests of judicial economy, the Plaintiffs concede that the facts alleged in the Complaint alone would likely be insufficient to vest this Court with the power to assert general jurisdiction over Reilly. But as requested in their Complaint (*see* Complaint at 6, n. 1) Plaintiffs would respectfully request this Court to permit them to conduct limited jurisdictional discovery to help them discover if Reilly (and Greenzweig) have sufficient contacts with this jurisdiction to comport with due process and D.C.'s long-arm statute.

### C.  This Court Can Assert Conspiracy Jurisdiction over Reilly and Greenzweig Based on Their Overt Acts Committed in the District

As alleged in the Complaint, this Court can assert conspiratorial jurisdiction over both Greenzweig and Reilly. While Plaintiffs cite to *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) ("*Halberstam*"), as the basis of their conspiratorial jurisdiction claim (a seminal case completely ignored by Greenzweig and Reilly), they acknowledge that *Walden* and subsequent decisions of this Court have changed the analysis slightly. To allege a conspiracy under *Halberstam*, a plaintiff must allege 1) an agreement between two or more people to 2) participate in an unlawful act, whereby 3) an injury occurred to the plaintiff due to an overt act performed by a party to the conspiracy and 4) which overt act was done pursuant to and in furtherance of the common scheme of the agreement.  *Halberstam*, 705 F.2d at 477.

Assuming this Court will follow the approach laid out in *Walden*, and subsequently *EIG Energy Fund XIV, L.P., v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D.D.C. 2017) ("*EIG Energy Fund*"), and *Cockrum*, the only other element added to the civil conspiracy analysis in this

District is that a plaintiff must allege that the "defendant knew his co-conspirator was carrying out acts in furtherance of the conspiracy *in the forum*." *Cockrum*, 319 F. Supp. 3d at 158 (citing to *EIG Energy Fund*, 246 F. Supp. 3d at 91. Moreover, as explained in the Complaint, "[c]onspiracy jurisdiction has been held to exist when a conspirator enters the forum and is deemed to [have] transact[ed] business there directly; [other] co-conspirators who never enter the forum are deemed to [have] transact[ed] business there by an agent. *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001) (internal quotation marks omitted).

Plaintiffs have already alleged each of the elements under *Halberstam* and its progeny. From the Complaint, it is clear that Plaintiffs have alleged that soon after the Complaint was filed, Greenzweig and Reilly entered into an agreement to obstruct justice in *Tomasello II* in order to get the case dismissed. *See*, *e.g.*, Complaint at ¶¶ 19, 59-60. Sometime after Lewis signed a contract to become McMahon and Tomasello's local counsel, Greenzweig and Reilly brought Lewis on board their conspiracy and she agreed to mislead McMahon into thinking she would be in attendance on critical court dates and that he had been admitted *pro hac vice*. *See*, *e.g.*, Complaint at ¶ 32-34. Hence, all three Defendants entered into an agreement to obstruct justice and secure dismissal of *Tomasello II* (an unlawful act), satisfying the first two elements of *Halberstam*.

Concerning elements 3 and 4 under *Halberstam*, both Tomasello and McMahon were obviously harmed as a result of Greenzweig's overt acts into the District and the object of the conspiracy itself. When Greenzweig made phone calls into McMahon's D.C. office threatening his associate, Fox, and McMahon with a bar complaint and sanctions, intentionally sent in faxes to his office to mislead McMahon about court dates which she represented had been agreed upon by Lewis, and filed a bar complaint against McMahon, both Tomasello and McMahon were harmed. This is because not long after the threatening phone calls, Fox left McMahon's employ fairly abruptly as a result of those threats, and, as a result, McMahon was forced to scramble to find new local counsel. *See id.* at ¶ 25.

Next, after McMahon secured new counsel in Virginia, Erlich, Greenzweig similarly threatened him, and he dropped out of *Tomasello II*. As a consequence, the Plaintiffs had to hire another local counsel, Lewis, who Greenzweig again later threatened and/or at least convinced to join the conspiracy. *See id.* at ¶ 27. Hence, as a result of the first two phone calls, *i.e.*, overt acts, and Greenzweig's subsequent threats to Erlich and Lewis, Plaintiffs were deprived of Lewis' valuable services of being in the courtroom for critical court dates and advancing her client's interests. *See*, *e.g.*, *id.* at ¶ 35. This deprivation ultimately led to the dismissal of *Tomasello II* (*i.e.*, the goal of the conspiracy), even though Judge Kassabian had originally allowed 17 days earlier two of Tomasello's claims to proceed, resulting in no damages or justice for Tomasello and no contingency fee for McMahon.

And to satisfy the additional requirement post-*Walden* for alleging conspiratorial jurisdiction, Plaintiffs have alleged that Reilly knew Greenzweig was committing overt acts in furtherance of their conspiracy to get *Tomasello II* dismissed. Specifically, Plaintiffs allege, for example, that Reilly and Greenzweig spoke about how she could get *Tomasello II* dismissed, and that Greenzweig told him that intimidating Fox was the only way she could guarantee dismissal. *Id.* at ¶¶ 20, 26.

Greenzweig and Reilly argue that the Plaintiffs do not allege in their Complaint that before Lewis and McMahon entered into an agreement, all three Defendants had begun conspiring to obstruct justice and end *Tomasello II*. Mem. P & A at 12. They then cite to *Cockrum* for the principle that any acts before a conspirator joined the conspiracy "cannot be in furtherance of the conspiracy and [are] therefore irrelevant to this court's personal jurisdiction analysis." *Id.,* 319 F. Supp. 3d at 185-86. This principle, they argue, applies here because Plaintiffs do not allege that Greenzweig and Reilly were aware Lewis came into the District to contract with McMahon to serve as his and Tomasello's local counsel. *Id.* at 13. Therefore, Greenzweig and Reilly argue this Court cannot assert personal jurisdiction over Greenzweig under a conspiracy jurisdictional theory.

24

Greenzweig and Reilly assert substantially the same arguments in relation to Reilly, with the addition of the argument that asserting jurisdiction would not be permitted under D.C.'s long-arm statute or comply with due process. *Id.* In addition, they contend that Plaintiffs do not allege that Reilly knew Greenzweig or Lewis were acting in furtherance of the conspiracy alleged herein in the District. *Id.*

Reilly and Greenzweig's arguments in relation to Lewis miss the point and ignore the Plaintiffs' other allegations. Again, by making threatening phone calls into the District after coming to an agreement with Reilly about what needed to be done to get *Tomasello II* dismissed, sending faxes in to McMahon's office to mislead McMahon about Lewis' attendance at critical court hearings, and filing a bar complaint in this District, Greenzweig has transacted business in the District under D.C. Code § 13-423(a)(1) and committed overt acts in furtherance of the conspiracy alleged herein—to obstruct justice in *Tomasello II* and secure the case's dismissal. *See Bellsouth Intellectual Prop. Corp. v. VCS Techs., Inc.*, No. CIV.A.04-1476 GK, 2004 WL 2475558, at *1 (D.D.C. Oct. 29, 2004) ("This Court has personal jurisdiction over Defendant because Defendant, by filing an application to register a mark with the … USPTO…has purposely availed itself of the laws of this jurisdiction.").

Moreover, as already contended herein *supra*, this Court has previously held that making phone calls and sending faxes into this district can allow a court here to assert jurisdiction over nonresident defendants. *See FC Investment Group,* 441 F.Supp.2d at 9 (citing to *Gorman v. Ameritrade Holding Corp.*, *supra*, 293 F.3d at 511 n. 4 (D.C. Cir. 2002)). As such, this Court can assert jurisdiction over Greenzweig and Reilly without ignoring due process, *i.e.*, notions of fair play and substantial justice.

## III.        Venue Is Appropriate in the District of Columbia

Greenzweig and Reilly argue that the District is an improper venue for the instant case for a number of reasons. Their main argument is that "the alleged events that give rise to the

claim occurred in Virginia". Mem. P & A at 16. Part of their justification for this argument is that any actions or conversations between Greenzweig and Reilly occurred in Virginia, and that the contacts Plaintiffs allege as a basis for this (*e.g.*, the phone calls and faxes into the District discussed *supra*) "are not a substantial part of the events that give rise to Plaintiffs' claims." *Id.* Finally, Greenzweig and Reilly cite to the Complaint for language regarding the District being a proper venue, but argue that these are not valid bases under the federal venue statute (28 U.S.C. § 1391). *Id.*

Plaintiffs concede that venue is proper only under the basis delineated in 28 U.S.C. § 1391(b)(2). However, they contend that a substantial part of the events that occurred in relation to this case actually occurred in the District. If the Court does a qualitative analysis, it will find that a majority of the overt acts done to further the conspiracy to obstruct justice in this case were performed in or conducted in the District. First, there are the two phone calls made by Greenzweig into the District that were in furtherance of the conspiracy because they were made in an attempt to obstruct justice by intimidating Fox and McMahon in dismissing *Tomasello II*, a meritorious case.

Then, this Court should consider the faxes Greenzweig sent into the District, at least some of which were sent in as part of an attempt to mislead McMahon into thinking Lewis would attend certain court hearings when, in fact, she would not be attending and informed Greenzweig of that fact. That is *prima facie* evidence of an attempt to obstruct justice and mislead the Court and McMahon as well. The most important of these faxes was one of the last faxes sent, which was regarding a hearing on FCFD's motion for reconsideration of Judge Kassabian's decision to allow two of Tomasello's claims to move forward and survive their demurrer. As alleged in the Complaint, Greenzweig coordinated with Lewis to not appear at that hearing, and Lewis did not appear. *See* Complaint at ¶¶ 32-33, 35. As a result of Lewis' failure to appear, McMahon was not allowed to speak to the court in defense of his client and oppose the

motion for reconsideration based on Virginia *pro hac vice* rules, and, as such, Judge Kassabian had no choice but to grant the Motion.  *See id*. at ¶ 35. And Plaintiffs assert that he granted the motion at least in part because it appeared to him that McMahon had lied to him about his *pro hac vice* status.

As far as what overt acts were committed in Virginia, Greenzweig's threats to Erlich occurred solely there, and the entering of the agreement regarding the conspiracy at least between Greenzweig and Reilly occurred there. Hence, from an actual review of the overt acts occurring in this case, a substantial amount of the events or omissions actually occurred in the District, **not** in Virginia.

Plaintiffs believe that a brief overview of Judge Collyer's analysis in *FC Investment Group* is instructive here as well. In her opinion, she correctly pointed out that the federal venue statute was amended in 1990 "to make venue proper in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *FC Investment Group*, 441 F. Supp. 2d at 11. This language is what is stated in 28 U.S.C. § 1391(b)(2) and is the provision Plaintiffs rely on, as discussed *supra*.

Judge Collyer then recited from Wright and Miller's Federal Practice and Procedure § 3806 (1994 Supp.): "**It is now absolutely clear that there can be more than one district where a substantial part of the events giving rise to the claim occurred.**" *Id.* (internal quotation marks and citation omitted) (emphasis added). This jurisprudence is of course contrary to the assertion made by Greenzweig and Reilly that Virginia is the sole judicial district where venue is appropriate. More importantly, Judge Collyer succinctly framed the proper question this Court must decide, *i.e*., "whether the District the Plaintiff chose had a substantial connection to the claim, **whether or not** other forums had greater contacts." *Id.* (internal quotation marks and citation omitted) (emphasis added).

Judge Collyer also addressed the issue of communications like those sent by Greenzweig into the District. She referenced the fact that false and misleading information had been given to the plaintiffs to induce their reliance on an investment decision. *Id.* at 12. She concluded in rejecting the defendants' claim that this is not an appropriate venue because those "communications have much more than a 'minimal nexus' to Plaintiff's claim". *Id.* The Plaintiffs herein allege that the 12 faxes sent into this jurisdiction were intended to deceive McMahon into thinking that Lewis would be available on particular dates when she knew that was not the case. This was the practice in *Tomasello II* for coordinating suitable dates for the next upcoming hearing and is standard motions practice in Fairfax County. *See* Complaint at ¶¶ 32-33. This is of course is only one instance showing the requisite intent on Greenzweig's part to engage in obstruction of justice, *i.e.,* she knew that McMahon would rely on her representation of "agreed upon dates".

Judge Collyer further addressed the defendants' contention that another state (Illinois) had a strong connection to the claim at issue as compared to D.C. She concluded that "even if Illinois, the site of many of the actions leading to the alleged fraud, has a strong connection to the claim, **it is now recognized that more than one forum can be an appropriate venue**…". *FC Investment Group*, 441 F. Supp. 2d at 12 (emphasis added). She found, for example, that the numerous communications of false and misleading information "were a significant part of the sequence of events" occurring in the District. *Id.*

Finally, she addressed the defendants' contention that a transfer of the case would be appropriate. *Id.* She cautioned that the defendants must satisfy two elements to convince the Court transfer would be appropriate: 1) establish that the plaintiff could have brought the action in the proposed transferee district in the first place; and 2) plausibly assert "that considerations of convenience and the interest of justice weigh in favor of transfer…" to that transferee district. *Id.* at 12-13. Judge Collyer also afforded the defendants the right to argue that the plaintiff's choice

of forum could be overcome if private and public interest factors clearly point toward trial in the alternative forum. *Id*. at 13.

However, Greenzweig and Reilly have not cited any private or public interest factors. For example, Greenzweig and Reilly have not "point[ed] to the existence of any factors that would cause them to experience extreme hardship in accessing evidence if venue were not transferred to [Virginia]". *See id.* They have in their possession today all of the evidence they need to defend the claims asserted herein. Moreover, the court can take judicial notice that since these individuals are located in Fairfax County, the only burden they would have to endure is a short car trip or Metro ride to enter the District.

In analyzing this issue, Judge Collyer addressed the burden of proof that the defendants had, *i.e.*, "the balance of convenience of the parties and witnesses and the interests of justice are in its favor". *Id.* at 13. She also observed, like just about every judge in this judicial district has, that Plaintiff's choice of forum is ordinarily afforded great deference. *Id*. She rejected the argument that since most of the evidence therein was in Illinois and the big events underlying the alleged fraud occurred there, transfer of venue was warranted. *Id*. She also pointed out that the defendant did "not demonstrate[] any great hardship such as inability to travel, significant expense, or medical disability that would adversely affect his ability to litigate this case [in the District]". *Id.* (internal quotation marks and citation omitted).

Judge Collyer moreover pointed out that "when analyzing the convenience of parties and witnesses, a defendant must show that witnesses would be unwilling to testify in the district of Columbia." *Id.* at 14. That is certainly not the case here, with Fairfax County so proximate. Not a single conspirator has affirmed in an affidavit that they would be unwilling to testify in the District. Why any of these conspirators would not be willing to testify in the District is unfathomable. For example, Lewis lives in the District. And based upon information and belief, Reilly routinely travels to the District to conduct fire department-related business.

Finally, Judge Collyer addressed the argument that Illinois law would have to be interpreted to decide the controversy at bar. *Id*. Nowhere in their motion to dismiss, however, do Greenzweig and Reilly make the claim that this Court would have some problem interpreting Virginia law or federal law (*e.g*., 42 U.S.C. § 1985). Judges in this judicial district interpret laws, whether foreign or domestic, every day in this court and this Court would not have to adjudicate complicated issues of law like whether there was an antitrust violation due to market price manipulations (not that this Court could not do that). And, at this time, it does not appear that there is any need for an expert to opine as to whether the Defendants, for example, obstructed justice in Judge Kassabian's court. The statute, 42 U.S.C. § 1985, is very clear on that point.

## IV.    This Court Has Subject Matter Jurisdiction

It is difficult to conceive why Greenzweig and Reilly place so much reliance upon *Moore v. Idealease of Wilmington*, 465 F. Supp. 2d 484, 488 (E.D.N.C. 2006) ("*Moore*"), as explained *infra*. *See* Mem. P & A at 5, 18-19. While the *Moore* Court did opine that: "Plaintiff's complaint did fall within the Rooker-Feldman doctrine", the rationale relied upon by the *Moore* Court has no application on the facts of the instant case. For example, "in substance, Plaintiff in Count I is seeking to set aside the state court judgment." *Id*. As a review of the instant complaint reveals, neither Tomasello nor McMahon is seeking to set aside the state court judgment in *Tomasello II* and would readily admit that Tomasello no longer has a remedy to pursue in Circuit Court.

Nor have the Plaintiffs herein alleged that the Defendants had "been tampering with witnesses or jurors, withholding and misrepresenting facts, and conspiring with the judges". In fact, Plaintiffs claim herein that Judge Kassabian, based on the allegations pled herein, was also a victim of the criminal conspiracy to obstruct justice, *i.e*., he had no idea that the reason that local counsel was not showing up to accompany McMahon was that she had been threatened by Greenzweig.

It is also instructive to focus on why the *Moore* Court thought that the plaintiff could not prevail in that litigation, to wit: "Stated differently, in order for Plaintiff to prevail in this Court, the Court would have to undue the state court judgment and declare that judgment invalid." In stark contrast to the facts at bar, the Plaintiffs, to prevail in this case, do not have to seek a declaration that the state court judgment is invalid. For them to prevail, they must allege and eventually prove that the Defendants obstructed justice and violated 42 U.S.C. § 1985, *inter alia*.

Moreover, Greenzweig and Reilly curiously cite a case which appears to undercut their arguments. In that case, the Court held that Rooker-Feldman doctrine did not apply and, in fact, discussed how the doctrine was limited by the Supreme Court. Mem. P & A at 18 (citing *Davani v. Va. Dep't of Transp.*, 434 F.3d 712 (4th Cir. 2006)). In that case, the Fourth Circuit acknowledged that the Supreme Court had "reined in the expansive interpretation of the Rooker-Feldman doctrine…" as seen in prior Fourth Circuit cases. *Davani*, 434 F.3d at 718 (citing *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)). The Court also reiterated that if a plaintiff "is not challenging the state-court decision, the Rooker-Feldman doctrine does not apply." *Davani*, 434 F.3d at 718-19.

In making that statement, the Court cited to a case decided a year earlier in that Circuit, *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) ("*Washington*"). There, the Court held that a plaintiff could bring a constitutional claim based on the fact that perjured testimony was part of the basis he was convicted. *Washington*, 407 F.3d at 280. Hence, the injury he was asserting arose out of the constitutional defects, not the state court judgment itself. *See id.*

This is the same situation as the instant case. Plaintiff Tomasello is bringing statutory and constitutional violations for violations of her rights in prosecuting her case. She, nor McMahon, are challenging the state court judgment or asking for this Court to set aside that judgment. She is simply asking for this Court to award her damages based on all three Defendants' violations of her constitutional rights.

Therefore, the Rooker-Feldman doctrine clearly does not apply to the instant case, and this Court has subject matter jurisdiction.

## V.     The Complaint States Claims upon Which Relief May Be Granted

### A.     The Complaint States Plausible Claims against Reilly

Plaintiffs assert that the Complaint adequately pleads that Reilly conspired to obstruct justice under 42 U.S.C. § 1983, conspired to deprive Tomasello of a fundamental civil right, *i.e.*, to prosecute a law suit in Virginia state court under 42 U.S.C. § 1985(2), and tortiously interfered with Plaintiff's contract with Lewis. The Complaint is replete with allegations that Reilly conspired and agreed with Greenzweig, his agent and attorney, to secure dismissal of *Tomasello II* by threatening Fox, McMahon, Erlich and Lewis with motions for sanctions and bar complaints if they did not cooperate and ultimately conspired with Lewis that she make herself unavailable for critical hearings. *See* Complaint at ¶¶ 6, 13-17, 19-21, 29, 31, 36, 59-61, 64-65, 67-69 and 85-92. The Complaint alleges meetings, conversations and agreements between Greenzweig and Reilly to secure dismissal of *Tomasello II,* to obstruct justice, and to interfere with Plaintiffs' contract with Lewis. *See id.* at 19-20, 29, 36 and 86-87. Again, comments like "What do we do with that prick?" are quite revealing in terms of the conspirators' state of mind.

To establish a *prima facie* case of malicious intentional interference with contractual relations, a plaintiff must show: 1) the existence of a valid contractual relationship or business expectancy; 2) knowledge of the relationship or expectancy on the part of the interferor, 3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and 4) resultant damage to the party whose relationship or expectancy has been disrupted. *Dunlap v. Cotton Transmission Systems, LLC*, 28 Va. 207, 216 (2014).[4]

---

[4] Plaintiffs agree with Reilly and Greenzweig that Virginia law applies to the tort claims.

Reilly and Greenzweig mistakenly argue that Plaintiffs must identify breach of a legal duty owed to Tomasello by Reilly based on *Okusami v. Psychiatric Institute of Washington, Inc*., 959 F.2d 1062, 1066 (D.C. Cir. 1992) ("*Okusami*"). In *Okusami*, the plaintiff made a negligence claim based on the proposition that certain bylaws imposed upon the defendants a duty to afford the plaintiff certain procedural rights. *Id*. When the *Okusami* Court stated that the plaintiff needed to allege an agreement "in addition to negligence", it was clearly referring to the plaintiff's negligence claim, not a requirement that civil conspiracy claims require breach of a legal duty owed to the plaintiff. *Id*.

In the instant case, Plaintiffs specifically plead that Reilly took action to interfere with Plaintiffs' contract with Lewis: 1) a contractual relationship existed between Tomasello and Lewis (*see* Complaint at ¶ 84); 2) Reilly knew about the contract as well as the responsibilities that Lewis had under the contract because he had shown up at every hearing and saw her in action (*see id*. at ¶ 85); 3) Reilly conspired with Greenzweig to threaten and pressure Lewis into withdrawing from *Tomasello II* (*see id*. at ¶¶ 86-88); and 4) Reilly was successful in causing damage to Tomasello by interfering with her contract with Lewis (*see id*. at ¶¶ 90-92).  Thus, Plaintiffs have alleged that Reilly directed and approved of Greenzweig's action to maliciously interfere with the contractual relationship and Count V states a claim upon which relief may be granted against Reilly.

As to Count I, Plaintiffs allege that Reilly conspired with Greenzweig and Lewis to obstruct *Tomasello II* by first threatening Fox, McMahon and Erlich to cause the withdrawal of Fox and Erlich and then conspiring with Greenzweig and Lewis to secure dismissal of *Tomasello II. See id*. at ¶¶ 60-62. Since Plaintiffs did not need to identify breach of a legal duty owed to Tomasello by Reilly, they have adequately alleged a cause of action against Reilly pursuant to 42 U.S.C. § 1983.

Regarding Count II, Plaintiffs allege that Reilly conspired with Greenzweig to deprive her of her fundamental civil right to prosecute a lawsuit against him in Virginia state court by first threatening Fox, McMahon and Erlich to cause the withdrawal of Fox and Erlich and then conspiring with Greenzweig and Lewis to secure dismissal of *Tomasello II*.  *See id*. at ¶¶ 64-65, 67-69. Since Plaintiffs did not need to identify breach of a legal duty owed to Tomasello by Reilly, they have adequately alleged a cause of action against Reilly pursuant to 42 U.S.C. § 1985(2).

**B.      Count II States a Cause of Action upon Which Relief May Be Granted as Plaintiffs Contend that Greenzweig and Reilly's Conspiracy to Obstruct *Tomasello II* Was Based on Sex and Race**

Plaintiffs contend they have alleged in Count II that Greenzweig and Reilly's conspiracy to obstruct *Tomasello II* was based on Tomasello's sex and race.  *See* Complaint at 2, ¶¶ 1, 3, 65 and 69. The comment "you're only here because you are black and female" speaks for itself. A claim under 42 U.S.C. § 1985(2) concerning conspiracies to obstruct justice in state courts must be based on "invidiously discriminatory animus behind the conspirators' action."  *See Kush v. Rutledge*, 460 U.S. 719, 725-726 (1983).  Should the Court conclude that Plaintiffs have not adequately pled discriminatory animus based on sex and race in Count II, Plaintiffs should respectfully be allowed leave to amend Count II to more specifically allege that Greenzweig and Reilly's conspiracy to obstruct justice was based on sex and race discrimination, particularly as the Complaint makes clear that that is indeed Plaintiffs' allegation.

**C.      Count I States a Cause of Action upon Which Relief May Be Granted as Plaintiffs Contend that Greenzweig and Reilly's   Conspiracy Violated their Fourteenth Amendment Right to Substantive Due Process and  Greenzweig Is Not Entitled to Immunity**

Plaintiffs argue that Count I states a cause of action upon which relief may be granted under 42 U.S.C. § 1983 for violation of Tomasello's right to substantive due process under the Fourteenth Amendment of the U.S. Constitution in that Greenzweig and Reilly's conspiracy to

deprive Tomasello of her liberty interest in prosecuting a civil case in state court in Virginia.

Plaintiffs claim that Greenzweig and Reilly acted under color of law which was made possible

because they acted with the authority of Virginia law.  Plaintiffs assert that the actions taken by

Greenzweig and Reilly to intimidate, threaten and employ undue influence and duress against

four different attorneys, Fox, McMahon, Erlich and Lewis, to secure dismissal of *Tomasello II*

shocks the conscience and constitutes malicious conduct unjustifiable by any proffered

government interest.  Plaintiffs contend that Greenzweig is not entitled to immunity because she

was not acting as a prosecutor in defending Reilly against a civil action and no reasonable county

attorney would have believed that her actions against the four attorneys did not constitute a

violation of Tomasello's substantive due process right.

A claim under 42 U.S.C. § 1983 must be based on action under color of law. *Shume v.*

*Pearson Education Inc*., 306 F. Supp. 3d 117, 126 (D.D.C. 2018). The traditional definition of

acting under color of state law requires that the defendant in a § 1983 action have exercised

power possessed by virtue of state law and made possible only because the wrongdoer is clothed

with the authority of state law. *Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005).

This Court discussed liberty interests protected by the Due Process Clause of the

Fourteenth Amendment in *Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 54-55 (D.D.C.

2016):

> Liberty interests protected by the Due Process Clause's substantive component are 'not
> absolute.' *Youngberg [v. Romeo]*, 457 U.S. at 319-20, 102 S.Ct. 2452. The question 'is
> not simply whether a liberty interest has been infringed,' but whether 'the extent or
> nature of' that infringement 'is such as to violate due process.' *Id*. at 320, 102 S.Ct. 2452.
> To that end, the Supreme Court has consistently reiterated that 'the 'Fourteenth
> Amendment is not a 'font of tort law to be superimposed upon whatever systems may
> already be administered by the States.'' [*County of Sacramento v.] Lewis*, 523 U.S. at
> 848-49, 118 S.Ct. 1708 (quoting *Paul v. Davis*, 424 U.S. 693 701, 96 S.Ct. 1155, 47
> L.Ed. 2d 405 (1976). Instead, the Court has 'emphasized time and again that '[t]he
> touchstone of due process is arbitrary action of government,'' and that the Constitution
> does not, of its own accord, 'guarantee due care on the part of state officials.' Id. at 845,
> 848-49, 118 S.C.1708 (alteration in original) (quoting *Wolff v. McDonnell*, 418 U.S. 539,
> 558, 94 S.Ct. 2963, 41 L.Ed. 2d 935 (1974)). When the actions of government officials

are at issue – as all agree they are here – the Court has 'repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'' and rise to the level of a cognizable constitutional violation. *Id.* at 846, 118 S.Ct. 1708 (quoting *Collins [v. City of Harker Heights, Texas*], 503 U.S. at 129, 112 S.Ct. 1061).

The doctrine of substantive due process constrains only egregious government misconduct. *George Washington University v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003). The doctrine prevents grave unfairness and may be shown in two ways: 1) a substantial infringement of state law prompted by personal or group animus, or 2) a deliberate flouting of the law that trammels significant personal or property rights. *Id*. The substantive component of the Due Process Clause is violated by executive abuse of power which shocks the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("*County of Sacramento*"). Conscience-shocking conduct that violates due process usually takes the form of affirmative state action. *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403, 372 U.S. App. D.C. 312 (D.C. Cir. 2006). A court's consideration of a substantive due process claim demands an exact analysis of the circumstances before any abuse of power is condemned as conscience shocking. *County of Sacramento*, 523 U.S. at 850. Deliberate conduct intended to inure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level. *Id*., 523 U.S. at 849.

Under the doctrine of qualified immunity, courts may not award damages against a government official in her personal capacity unless the official violated a statutory or constitutional right and the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 725 (2011). The relevant inquiry for qualified immunity purposes is whether the government official could reasonably have believed that her actions did not violate a statutory or constitutional right. *See Lane v. Franks*, 573 U.S. 228, 242 (2014).

In the instant case, Plaintiffs have alleged that Tomasello's Fourteenth Amendment rights were violated by Greenzweig and Reilly's conspiracy to obstruct justice and secure dismissal of

*Tomasello II* by conscience-shocking means.[5]  Greenzweig and Reilly did not contend in the Motion to Dismiss that they did not act under color of Virginia law.  Rather, they argue that they did not deprive Tomasello of her right to substantive due process under the Fourteenth Amendment by preventing her from litigating *Tomasello II.* Plaintiffs counter that Greenzweig and Reilly's conspiracy to obstruct justice constituted egregious government misconduct as well as a deliberate disregard of Tomasello's liberty interest in litigating a civil action in Virginia state court, conduct that is clearly protected by the Fourteenth Amendment. Greenzweig and Reilly contend throughout the Motion to Dismiss that Tomasello lost *Tomasello II* for reasons other than their obstruction, but that contention ignores their unscrupulous and thuggish conspiracy to ensure Tomasello lost. Plaintiffs assert that 42 U.S.C. § 1983 was enacted to deter exactly the kind of egregious behavior engaged in by Greenzweig and Reilly to rig a civil action in their favor. Therefore, Count I should not be dismissed for failure to state a claim upon which relief may be granted.

Also, Greenzweig clearly was not acting as a prosecutor in representing Reilly as a defendant in a civil action. Plaintiffs did not allege in Paragraph 55 of the Complaint that Greenzweig was acting as a prosecutor in *Tomasello II* but rather only alleged that her duties as a county attorney included prosecuting. Further, no reasonable county attorney could have believed that threatening attorneys into withdrawing from an ultimately meritorious case and getting Lewis to agree to not appear for critical hearings was not a violation of Tomasello's liberty interest in litigating her claims in Virginia state court. Thus, Greenzweig is not entitled to immunity for violating Tomasello's basic constitutional rights and denying her substantive due process.

---

[5] Should the Court determine that Plaintiffs have not pled with specificity that Tomasello's right to substantive due process under the Fourteenth Amendment, Plaintiffs should respectfully be allowed leave to amend Count I to more specifically allege that Greenzweig and Reilly's conspiracy to obstruct her from prosecuting *Tomasello II* deprived her of her right to substantive due process.

### D. The Complaint States a Claim upon Which Relief May Be Granted for Malicious Intentional Interference with Contractual Relations

Plaintiffs assert that Count V states a claim upon which relief may be granted because: 1) Plaintiffs allege that Greenzweig and Reilly used threats, intimidation, undue influence and duress against Lewis to interfere with Tomasello's contract with Lewis and to ensure dismissal of *Tomasello II*, 2) Tomasello suffered damage from obstruction of her right to prosecute *Tomasello II*, and 3) Greenzweig is not shielded by sovereign immunity because Plaintiffs allege that she engaged in intentional misconduct in tortuously interfering with Tomasello's contract with Lewis.

The Supreme Court of Virginia set forth the methods of interference with contractual relations which are considered improper in *Duggin v. Adams,* 234 Va. 221, 360 S.E.2d 832, 836 (1987):

> Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 308 (Utah 1982). Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship.

Greenzweig and Reilly do not address an obvious issue—whether sovereign immunity shields an employee of the Commonwealth of Virginia acting within the scope of her employment based on a claim of gross negligence or intentional misconduct. *See Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657, 662 (1984).

In the instant case, Plaintiffs claim that Greenzweig and Reilly used threats, intimidation, undue influence and duress in interfering with Tomasello's contract with Lewis when: 1) Greenzweig threatened Lewis with a motion for sanctions and a bar complaint, 2) Greenzweig convinced Lewis to remain in *Tomasello II* to join with Reilly and her to secure dismissal by informing Greenzweig about when she was not available for hearings without informing McMahon about her unavailability, 3) Greenzweig convinced Lewis to falsely inform McMahon

that his *pro hac vice* admission had been granted, 4) Greenzweig convinced Lewis to withdraw from *Tomasello II*, and 5) Tomasello suffered significant damages from being precluded from prosecuting *Tomasello II*.   See Complaint at ¶¶ 29, 31-34, 85-92.  Plaintiffs thus have alleged that Greenzweig and Reilly's intentional interference with Tomasello's contract with Lewis was through improper methods.  And they have alleged that she suffered damage from being obstructed from prosecuting *Tomasello II*.  Therefore, Count V states a viable claim upon which relief may be granted.

Further, Greenzweig cannot avail herself of sovereign immunity because the Complaint is replete with allegations that she engaged in intentional and malicious misconduct in interfering with Tomasello's contract with Lewis.

### E.      *Res Judicata* **Does Not Bar the Plaintiffs' Claims**

Greenzweig and Reilly essentially assert that the Complaint is barred by *res judicata* as a result of *Tomasello I. See* Mem. P & A at 38-39. While they do not assert which aspect of *res judicata* they are contending precludes Plaintiffs' claims from moving forward, it appears they are asserting a claim preclusion theory versus an issue preclusion theory. In the event that their argument is asserting Plaintiffs' claims are barred due to issue preclusion, Plaintiffs will quickly dispose of this argument.

To successfully argue that issue preclusion applies to the present case, Greenzweig and Reilly must demonstrate: "(1) that the party against whom preclusion is asserted have been a party to the prior case…; (2) the issue presently raised must have been actually litigated in the prior case…; (2) [sic] the issue must have been 'actually decided' by a final judgment of a court of competent jurisdiction…; (3) determination of the issue must have been 'essential to the judgment,'…; and (4) 'preclusion in the second case must not work a basic unfairness to the party bound by the first determination[, such as]…when the losing party clearly lacked any incentive to litigate the point in the first trial'." *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp.

2d 240, 302-03 (D.D.C. 2011) ("*Lans*") (internal citations omitted). In addition, "issue preclusion bars only the relitigation of specific issues actually adjudicated in prior proceedings" and "[t]he prior judgment is the foundation…" for it. *Id.* (citing *Athridge v. Aetna Cas. and Sur. Co.*, 604 F.3d 625, 634 (D.C. Cir. 2010)).[6]

Obviously, Tomasello was a party in both *Tomasello I* and *II*, so the first element discussed herein is satisfied. However, none of the other elements are met here. In fact, none of the issues raised herein were ever litigated in either of those cases. As already explained, the issues asserted in the instant case arise out of the criminal conduct on the part of all three Defendants herein in securing dismissal of *Tomasello II*. The subjects and issues of *Tomasello I* and *II* concerned the mistreatment and invidious discrimination Tomasello faced as a member of FCFD. *See* Defendants' Exhibits 8 and 12 to the Motion to Dismiss. Moreover, neither the Eastern District for Virginia nor Fairfax County Circuit Court ever decided whether the three Defendants herein obstructed justice in *Tomasello II*, *inter alia*. An obvious question is how could they have decided those issues since those issues were not before the Court.

Additionally, a determination of whether the three Defendants named herein obstructed justice in *Tomasello II*, for example, was not necessary to determine the outcome of *Tomasello II*, as the Circuit Court did not need to consider that issue in reaching its decision to dismiss the case. And finally, there is no unfairness to the named Defendants to litigate the issues alleged herein. Instead, it was unfair for the Defendants to obstruct justice and secure dismissal of a meritorious case, *i.e.*, Judge Kassabian had denied the County's demurrer with respect to two counts. And it

---

[6] The elements of issue preclusion or collateral estoppel are the same in Virginia if the Court rules that law applies to the parties' *res judicata* arguments. *See, e.g., Nat'l Am. Ins. Co. v. Ruppert Landscape Co.*, 122 F. Supp. 2d 670, 677 (E.D.V.A. 2000) ("(1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.") (citation omitted).

was not the Plaintiffs' fault that they could not raise the issues they describe regarding Greenzweig's malicious conduct, for example, as McMahon could not address the court without local counsel, which he did not have as a result of Greenzweig's criminal conduct whereby she used intimidation, threats, and use of duress and undue influence towards McMahon's three local counsel (*i.e.*, threatening sanctions and a bar complaint). Therefore, Greenzweig and Reilly have not met their burden of satisfying each element and Plaintiffs' claims should not be barred by issue preclusion.

In regard to claim preclusion, Greenzweig and Reilly similarly have the burden of demonstrating each of the following elements are satisfied herein: "(1) there must have been a final judgment on the merits, (2) the judgment must have been made by a court of competent jurisdiction, (3) the present claim must be the same as a claim that was raised or that could have been raised in the first proceeding, and (4) the parties [or privies] must be identical in both suits." *Lans*, 786 F. Supp. 2d at 302. Moreover, the prior judgment "bars any further claim based on the same nucleus of facts, for it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984) (internal quotation marks and citations omitted).[7]

Furthermore, this Court uses the Restatement (Second) "transactional approach under which a cause of action for purposes of claim preclusion, comprises all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a transaction and what groupings constitute a series…are to be determined pragmatically, considering whether the facts are related in time, space, origin, or motivation, whether they form

---

[7] The elements of claim preclusion are also the same for D.C. and Virginia. *See*, *e.g.*, *United States v. Tatum*, 943 F.2d 370, 381 (4th Cir. 1991) ("when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.") (internal quotation marks and citations omitted).

a convenient trial unit [, etc.]." *Stanton v. D.C. Court of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) (internal quotation marks and citations omitted). In addition, "[t]hough no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first." Restatement (Second) of Judgments § 24 (1982).

In relation to the instant case, Greenzweig and Reilly are trying to shoehorn this case into the same nucleus of operative facts alleged in *Tomasello I* and, in effect, *Tomasello II*. However, as already explained herein, this case is much different than either of those cases. Again, those cases involved Tomasello's claims of discrimination under Title VII (*Tomasello I*) and claims of civil conspiracy and intentional infliction of emotional distress (*Tomasello II*), *inter alia*, based on issues and claims arising out of Tomasello's employment with the FCFD. This case, as the Court is aware, arose out of the conduct of one of the defendants in *Tomasello II* (Reilly), the attorney for that defendant (Greenzweig), and the local counsel for the Plaintiffs herein (Lewis), in conducting their business and/or carrying out their responsibilities in reference to *Tomasello II*, whereby they obstructed justice. For example, while Greenzweig was required to confer with Fox about preliminary matters in *Tomasello II*, she was not required and in fact should not have threatened to file a sanctions motion against him or a bar complaint.

Additionally, the claims asserted in the instant case all arose after *Tomasello II* was decided. Plaintiffs assert that only after *Tomasello II* was decided, did McMahon first become aware that a conspiracy had been afoot. Plaintiffs allege that McMahon received an email after *Tomasello II* was dismissed from Lewis detailing her hours for work performed in that case. *See* Complaint. at ¶ 31; Email exchange between Lewis and McMahon at Exhibit 2. Lewis' email dated February 19, 2017, stated that she had exchanged around 80 emails and various phone calls with Greenzweig over the course of her time spent in the case. *See id*. When McMahon reviewed that email in some detail, he first began to realize what had happened—Lewis, because she had been threatened with

a bar complaint and sanctions, had conspired with Greenzweig and Reilly to secure dismissal of *Tomasello II*. She knew what the term "agreed upon dates" meant.

The full picture came into focus when McMahon realized what Lewis had done, or not done, in *Tomasello II* including: misleading McMahon into thinking he was admitted *pro hac vice* (*see* Complaint at ¶ 34), misleading McMahon into thinking she was going to be available for upcoming critical court hearings by giving Greenzweig the dates she would be unavailable (*see* Complaint at ¶ 32), and then not appearing at those hearings without advising McMahon beforehand leaving him with no local counsel and no ability to address the court (*see* Complaint at ¶ 35). Once he began understanding the basis of Lewis' malicious conduct and obvious omissions, he thought about why an attorney such as she who had been ecstatic about working with him on *Tomasello II* was now doing everything possible to hurt the case. *See* Exhibit 1 at ¶ 3, At this point, he remembered the conversation he overheard between Reilly and Greenzweig after oral argument was held on Reilly's demurrer and two of Tomasello's claims were allowed to proceed (*i.e.*, Reilly asked Greenzweig "[w]hat are we going to do about that prick" in reference to McMahon) (*see* Complaint at ¶ 36)), and the phone calls he and his associate, Fox, had taken from Greenzweig wherein she threatened both of them with sanctions and a bar complaint simply because they had filed a meritorious case on behalf of an aggrieved plaintiff. *See id*.

Hence, the conspiracy alleged herein was never discussed or litigated on the merits during either *Tomasello* case, nor could they have been litigated at the time because Plaintiffs were not on notice of the criminal conspiracy to obstruct justice. Moreover, the issues raised in the instant complaint, then, could not have formed a "convenient trial unit", nor could it be argued that they came out of a common nucleus of operative facts, and therefore, the Plaintiffs' claims herein should not be barred by claim preclusion.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be DENIED.

Respectfully submitted,


_____/s/_____
Mark G. Chalpin, Esq.
(DC Bar #366794)
116 Billingsgate Lane
Gaithersburg, MD 20877
Tel: (301) 990-4900
Fax: (832) 201-7392
mark.chalpin@gmail.com
*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum of Points and Authorities in Support of Opposition to Defendants Jamie Greenzweig and Michael T. Reilly's Motion to Dismiss was filed and served via CM/ECF on this 15th day of April, 2019, upon the following parties of record:

John D. McGavin, Esq
Bancroft, McGavin, Horvath and Judkins, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, VA 22030

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314


_____/s/_____
Mark G. Chalpin