**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PATRICIA TOMASELLO, et al.** | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Case No. 1:19-cv-00384 (KBJ) |
| | : | |
| **JAMIE GREENZWEIG, et al.** | : | |
| | : | |
| Defendants | : | |

**<u>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF OPPOSITION TO DEFENDANT HASINA LEWIS'
MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………… ii

COUNTERSTATEMENT OF FACTS …………………………………………… 2

ARGUMENT ……………………………………………………………… 9

I.      Standard of Review …………………………………………………  9

II.     This Court Can Assert Subject Matter Jurisdiction over Plaintiffs' Claims …..10

III.    Venue in this Judicial District Is Proper and the Private and Public
        Interest Factors Do Not Weigh in Favor of Transfer to the Eastern
        District of Virginia …………………………………………………… 11

IV.     Tomasello States Plausible Claims against Lewis upon Which Relief
        May Be Granted ……………………………………………………… 15

        A.  Tomasello States a Claim against Lewis for Conspiracy to Violate
            her Rights in Violation of 42 U.S.C. § 1983 and to Obstruct
            Justice in Violation of 42 U.S.C. § 1985(2) ……………………… 15

        B.  McMahon States a Claim upon Which Relief May Be Granted
            against Lewis for Breach of Contract Based on Being a
            Third-Party Beneficiary of Lewis' Contract with Tomasello …………….. 17

        C.  Tomasello States a Claim against Lewis for Breach of Contract
            and Legal Malpractice upon Which Relief May Be Granted  …………….. 20

CONCLUSION ………………………………………………………………… 22

CERTIFICATE OF SERVICE ………………………………………………… 23

# TABLE OF AUTHORITIES

## CASES

Page No.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ……………………………………………… 10

*BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002) ……………………………….. 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) ………………………… 10

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ……………….. 15

*Dennis v. Sparks*, 449 U.S. 24, 27 (1980) ………………………………………………… 15

*Doctors Co. v. Women's Healthcare Associates, Inc*., 285 Va. 566,
740 S.E.2d 523, 527 (2013) ……………………………………………………………….. 18, 21

*Dunn Construction Co. v. Cloney*, 278 Va. 260, 682 S.E.2d 943, 946 (2009) ………. 21

*Eckington & Soldiers' Home Ry. v. McDevitt*, 191 U.S. 103, 111 (1903) …………… 19

*FC Investment Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 11-12 (D.D.C. 2006)…. 12, 13, 14

*Freeman v. Fallin*, 254 F. Supp. 2d 52, 56 (D.D.C. 2003) …………………………… 10

*Hawkins v. Washington Metro. Area Transit Auth*., 311 F.Supp.3d 94, 100
(D.D.C. 2018) ……………………………………………………………………………… 9, 10

*Jeong Seon Han v. Lynch*, 223 F.Supp.3d 95, 103 (D.D.C. 2016) …………………… 9, 10

*Kamlar Corp. v. Haley*, 224 Va. 699, 705, 299 S.E.2d 514 (1983) ………………….. 21

*Kelly Health Care, Inc., v. Prudential Insurance Co*., 226 Va. 376, 380,
309 S.E.2d 305, 307 (1983) ……………………………………………………………….. 18

*Kelly v. Stamos*, 285 Va. 68, 73, 737 S.E.2d 218 (2013) …………………………….. 18

*Kerns v. Wells Fargo Bank, N.A*., 296 Va. 146, 818 S.E.2d 779, 785 (2018) ………...18-19

*O'Connell v. Bean*, 263 Va. 176, 556 S.E.2d 741, 743 (2002) ……………………… 20

*Pendleton v. Mukasey*, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) ……………………… 10

*Shipman v. Kruck*, 267 Va. 495, 501, 593 S.E.2d 319, 322 (2004) …………………. 20

*Smith v. Yeager*, 234 F. Supp. 3d 50, 55 (D.D.C. 2017) ………………………………13, 14

Page No.

*Thorsen v. Richmond Society for the Prevention of Cruelty to Animals*,
292 Va. 257, 786 S.E.2d 453; 459 (2016) ……………………………………… 18

*Tower v. Glover*, 467 U.S. 914, 923 (1984) ……………………………………… 15

*Valley Landscape Co. v. Rolland*, 218 Va. 257, 260, 237 S.E.2d 120, 122 (1977)…18

*Weinberger v. Tucker*, 391 F. Supp. 2d 241 (D.D.C. 2005) ……………………… 11

*Williams v. Joynes*, 278 Va. 57, 677 S.E.2d 261, 264 (2009) ……………………... 20

## UNITED STATES CONSTITUTION

1st Amendment of the United States Constitution ………………………………… 16

14th Amendment of the United States Constitution ……………………………… 16

## STATUTES

28 U.S.C. § 1404(a) ………………………………………………………………… 11, 13

42 U.S.C. § 1983 …………………………………………………………………... 3, 15, 16

42 U.S.C. § 1985(2) ………………………………………………………………… 3, 15, 16

## RULES

Fed. R. Civ. P. 12(b)(1) …………………………………………………………… 2, 9

Fed. R. Civ. P. 12(b)(3) …………………………………………………………… 2, 10

Fed. R. Civ. P. 12(b)(6) …………………………………………………………… 2, 10

## TREATISES

13 Willison on Contracts § 37:1, at 14-15
(Richard A. Lord ed., 4th ed. 1990 & 2013 rev.) ………………………………….. 18

Plaintiffs Patricia Tomasello ("Tomasello") and Martin McMahon ("McMahon"), by undersigned counsel, respectfully file their Memorandum of Points and Authorities in Opposition to Defendant Hasina Lewis' ("Lewis") Motion to Dismiss ("Motion to Dismiss") pursuant to Fed. R. Civ. Pro. 12(b)(1), (3), and (6) as follows:

## COUNTERSTATEMENT OF FACTS

Plaintiffs are seeking redress for injuries sustained as a direct result of the criminal conspiracy engaged in by Lewis and Defendants Jamie Greenzweig ("Greenzweig") and Michael T. Reilly ("Reilly") to obstruct justice to secure the dismissal of Tomasello's case entitled *Tomasello v. Reilly* ("*Tomasello II*"), which had been filed by McMahon's law firm in Fairfax County Circuit Court ("Circuit Court"). Defendants conspired to ensure that no local Virginia-licensed attorney would be present in Circuit Court representing Tomasello to defend against dispositive motions filed by Greenzweig on behalf of the Fairfax County Fire Department ("FCFD"). The goal of the conspiracy was to ensure the absence of local counsel at the hearings on dispositive motions so that Tomasello's arguments would not be heard and the dispositive motions would be granted, resulting in dismissal with prejudice of *Tomasello II*.

Greenzweig, in conspiracy with Reilly, scheduled dates for oral argument on dispositive motions (*e.g.*, demurrers), and set down a discovery schedule, knowing that Lewis, Tomasello and McMahon's local counsel, would not be present on those dates. Lewis did not appear because Greenzweig had threatened her with a sanctions motion and a possible bar complaint if she did not abandon *Tomasello II*. Greenzweig had used the same tactic successfully, in conspiracy with Reilly, to convince Tomasello's two former local counsels to withdraw. Lewis also did not appear as part of her conspiracy with Greenzweig and Reilly because Judge Kassabian, the judge in *Tomasello II*, had denied FCFD's demurrer and allowed the case to proceed on two counts. As a result of the second unexplained failure to have Lewis present at these hearings and Lewis' sudden withdrawal, *Tomasello* II was dismissed with prejudice as a

direct result of Defendants' successful efforts to obstruct justice in violation of 42 U.S.C. §§ 1983 and 1985(2).

In her Memorandum of Points and Authorities ("Mem. P & A") in support of her Motion to Dismiss, Lewis essentially contends that she withdrew from *Tomasello II* not because of the conspiracy alleged in the Complaint amongst her, or that Greenzweig and Reilly tried to obstruct justice to secure dismissal of *Tomasello II*, but rather because she did not like working with McMahon on *Tomasello II*. *See* Mem. P & A at 7-8. This is sheer nonsense. She did not employ a well-known tactic and tell McMahon that the case did not have merit, but instead, she told him that this case was too time-consuming. *See id*. This was a complete fabrication for two reasons. First, she had only appeared twice in Court and had not written any legal memoranda. Second, she had profusely commended McMahon for his willingness to take on this type of case to represent black female firefighters challenging FCFD. *See id*.

Tomasello has been employed by FCFD for over 20 years and learned early on how racist the department was, *i.e*., she was told "the only reason you're here is because you're black and female." *See* Complaint at ¶ 1. She experienced severe work place harassment including: 1) removal from an arson investigation squad for no reason, 2) being ordered out on fire runs while on light duty status and undergoing chemotherapy. *See id*. Reilly had been trying to run her out of the department ever since she had started working for him. *See id*. at ¶¶ 1, 5. Based on a pretext, he eventually transferred her to a civilian position where she still works at a severely reduced salary with a significant loss of job benefits. *See id.* at ¶ 5.

McMahon and his law firm filed *Tomasello II* in Fairfax County to seek justice for Tomasello after *Tomasello I* had been dismissed in the Eastern District of Virginia. *See id*. at ¶ 2. Lewis contracted with both Tomasello and McMahon to serve as local counsel in *Tomasello II*. *See id.* She then literally abandoned *Tomasello II* in January 2017. *See id*. at ¶ 4; McMahon Declaration at Exhibit 1 at ¶ 2; October 10, 2016 emails between McMahon and Lewis at Exhibit

2. After a series of meetings with Greenzweig, she conspired with Greenzweig and Reilly to obstruct justice and secure dismissal of *Tomasello II*, in spite of her contractual and ethical obligations to Tomasello and McMahon. *See id*. at ¶¶ 4, 16. Greenzweig and Reilly thereby maliciously interfered in Plaintiffs' contract with Lewis to ensure she abandoned her role as local counsel. *See id*. at ¶ 16. Moreover, not only did Greenzweig and Reilly violate three separate criminal statutes, but also Greenzweig violated Virginia Bar Rules, as detailed in the Complaint.

Evidencing her malice toward Tomasello, Greenzweig told McMahon that she resented the fact that Tomasello had the nerve to file a second case in state court after dismissal of *Tomasello I. See id*. at ¶ 3. Reilly criticized Greenzweig for allowing the initiation of a new state court case, *Tomasello II*, after dismissal of *Tomasello I. See id*. Greenzweig explained to Reilly that *Tomasello II* was far more dangerous than *Tomasello I* in that it could set a precedent that fire chiefs could be sued by line officers for various torts. *See id*. at ¶ 19. Her assessment turned out to be correct because Judge Kassabian made that precise ruling in January 2017 when he denied Defendants' demurrer in part.  *See id*. at ¶ 20.

When Reilly asked Greenzweig what would happen if the Court denied FCFD's demurrer, she told him the only way she could guarantee dismissal was by threatening Tomasello and McMahon's first local counsel, Jameson Fox, Esq. ("Fox"), who was right out of law school, with sanctions and a possible bar complaint. *See id*. at ¶¶ 20, 26. She advised Reilly that, if Fox were sufficiently intimidated, he could dismiss *Tomasello II* on his own. *See id*. at¶ 20. The reason—Fox could dismiss the case because he was barred in Virginia while McMahon was not. *See id*.

The first overt act engaged in by Greenzweig in the District was to place a long phone call to McMahon's law firm to speak with Fox, whom she knew to be the only Virginia-barred associate in McMahon's law firm. *See id*. at ¶ 21. Greenzweig threatened Fox and told him that, unless he dismissed the *Tomasello* case immediately, she would file a motion for sanctions and a

bar complaint against him as he was the Virginia-barred attorney who had filed the complaint. *See id.*

Greenzweig's dual threat had a profound effect on Fox as he immediately rushed into McMahon's office, who was his boss, after ending his conversation with Greenzweig. *See id.* at ¶ 22. Fox usually called before entering McMahon's office, but this time he just burst in and was obviously very upset. *See id.* He asked McMahon if Greenzweig could actually file a bar complaint against him and what impact a bar complaint would have on his future opportunities. *See id.* McMahon candidly told him that Greenzweig could file a bar complaint against him and that, because she was with the County Attorney's office, bar counsel would likely treat her complaint with great deference. *See id.* It was obvious to McMahon that Fox was quite concerned about Greenzweig's threats to his future livelihood and McMahon's assessment of the threats. *See id.*

Greenzweig's second overt act in the District occurred approximately one week later when she again called McMahon's law firm asking for Fox. *See id.* at ¶ 22. Fox was unavailable, and McMahon took the call. *See id.* Greenzweig repeated her threat of filing a sanctions motion and stated that she wished that McMahon was barred in Virginia so that she could file a bar complaint against him. *See id.* McMahon then informed Fox about his conversation with Greenzweig and the separate threats made by her. *See id.* Fox appeared more disturbed than after his own previous conversation with Greenzweig. *See id.* at ¶ 24. He once again asked McMahon what adverse effect a bar complaint could have on his career. *See id.* McMahon told him that the bar complaint would probably be dismissed even though Greenzweig was with the County Attorney's office. *See id.* However, he told Fox that he would likely be explaining the bar complaint for the rest of his professional career because any potential Virginia employer would have a reasonable basis to ask him why a bar complaint had been filed against him by the Fairfax County Attorney's Office. *See id.*

Three to four weeks after McMahon's conversation with Greenzweig, Fox told McMahon out of the blue that he was leaving the firm. *See id*. at ¶ 25. McMahon was shocked because Fox had participated in his annual performance review and received a substantial raise before filing the *Tomasello* case. *See id*. During the performance review, Fox told McMahon that he wanted to remain in the firm for at least a couple more years to hone his litigation skills. *See id*.

The third overt act occurred in Virginia approximately four weeks later after McMahon hired a competent Virginia local counsel, Joshua Erlich ("Erlich"). *See id*. at ¶ 27. Erlich was initially thrilled to be working on *Tomasello II*, looked forward to establishing new precedent in Fairfax County. *See id*. Then, Greenzweig threatened Erlich as she had with Fox and McMahon, and Erlich wanted nothing to do with *Tomasello II* as a result. *See id*. Erlich later told McMahon, "Martin, you don't practice out here [in Fairfax County.]  I can't afford to have an enemy in the County Attorney's Office." *See id*.

After Erlich repudiated his oral contract to act as local counsel in *Tomasello II*, Greenzweig and Reilly knew that McMahon would have to find new local counsel (*i.e.*, his third local counsel) and found Lewis in early Fall 2016. *See id*. at ¶ 28.  Lewis came to the District to negotiate a contract with McMahon to work on the *Tomasello* case. *See id*.; Exhibit 2. McMahon informed her that one of the main requirements was that she had to attend all hearings with McMahon in order that he could address the Court even if he were eventually admitted *pro hac vice*. *See id*. Lewis acknowledged this requirement and agreed to attend all hearings. *See id*. She entered her appearance in the *Tomasello* case on October 11, 2016. *See* Complaint at ¶ 28.

Greenzweig and Reilly conferred again and agreed that once more Greenzweig would have to threaten new local counsel, Lewis, with a motion for sanctions and a bar complaint to ensure dismissal of the *Tomasello* case. *See id*. at ¶ 29. Greenzweig and Reilly knew that it would be difficult for McMahon to secure yet another replacement given time constraints and the nature of the *Tomasello* case. *See id*. Greenzweig then made the same threats to Lewis that she

had made to Fox and Erlich. *See id*. at ¶ 31. Greenzweig's numerous conversations with Lewis were confirmed by time sheets submitted by Lewis to McMahon to justify her billing statement. *See id*. Much to McMahon's surprise, Lewis informed him that she had exchanged approximately 80 emails with Greenzweig in three months. *See id*. The extraordinary amount of emails convinced McMahon that Lewis had not just been talking to Greenzweig to set dates for oral argument but also was obstructing justice by coordinating dismissal of *Tomasello II* because she knew that Lewis would not be appearing at hearings.  *See id*.

Instead of pushing Lewis to withdraw as she had done with Fox and Erlich, Greenzweig convinced Lewis to remain in the Tomasello case and join in with Reilly and her. *See id*. at ¶ 32. Greenzweig gave Lewis two duties to secure dismissal. *See id*. First, Lewis would keep Greenzweig informed about her schedule and the dates she would not be available for oral argument. *See id*. Lewis agreed to do so without informing McMahon so he would not know she would not be appearing at important court dates. *See id*. Knowing Lewis' schedule, Greenzweig was able to send approximately 12 faxes to McMahon's office, which constituted further overt acts committed in the District, seeking McMahon's confirmation about particular dates when Greenzweig knew Lewis would not be present in court. *See id*. at ¶¶ 32-33. Because this was the way the parties had scheduled earlier hearings, these faxes misled McMahon into thinking that Lewis had already agreed to the dates suggested by Greenzweig and would be available to attend hearings on those dates. *See id*. at ¶ 33. McMahon consented to the dates requested by Greenzweig for upcoming important hearings not knowing that Lewis had already informed Greenzweig that she would not be available on those dates.  *See id*.

The second duty that Lewis agreed to perform was to mislead McMahon about the status of his *pro hac vice* admission. *See id*. at ¶ 34. On January 4, 2017, Lewis emailed McMahon that she had spoken to the Circuit Court clerk, who had told her that McMahon was admitted *pro hac vice*. *See id*. This was a misrepresentation as both Greenzweig and Lewis knew McMahon had

had not been admitted *pro hac vice*. *See id*.  The email was also another overt act committed in the District.

Consistent with her agreement with Greenzweig, Lewis did not appear at a critical hearing on January 20, 2017. *See id*. at ¶ 35. Her failure to appear prevented McMahon from speaking to the Court and opposing the County's demurrer even though he had stated to the Court that he was admitted *pro hac vice*. *See id*. Greenzweig then informed the Court that McMahon was lying about his *pro hac vice* status. *See id*. Notwithstanding a lack of opposition except as provided in a written Opposition to the demurrer, Judge Kassabian allowed two of Tomasello's claims to move forward based on the detailed allegations made in her amended complaint. *See id.* While leaving the courtroom that day, McMahon overheard Reilly say to Greenzweig, "What are we going to do about that prick [, McMahon]?" *See id*. at ¶ 36. Greenzweig then filed a bar complaint against McMahon with the DC Bar Counsel, another overt act occurring in the District, evidencing a criminal intent to obstruct justice. *See id*. at ¶¶ 36, 40.  Upon receiving the bar complaint, McMahon realized the significance of Reilly's remark. *See id*. at ¶ 36.

As a result of Lewis' dropping out on short notice, McMahon could not file a timely response to Greenzweig's motion for reconsideration of Judge Kassabian's favorable January 20, 2017 decision. *See id*. at ¶ 38. On February 6, 2017, Judge Kassabian granted the motion for reconsideration and reversed his earlier decision in favor of Tomasello. *See id*. The motion for reconsideration that he granted and that Greenzweig had submitted had no new facts for the Court to rely on, nor any new caselaw.  *See* Declaration of McMahon at Exhibit 1 at ¶ 3. He eventually dismissed *Tomasello II* with prejudice when Lewis once more inexplicably failed to appear at a second crucial hearing, despite the fact that Judge Kassabian had specifically ordered her to appear. *See* Complaint at ¶ 38.

As a result of the Defendants' conspiracy to obstruct justice, Judge Kassabian was unable to provide Tomasello the opportunity to argue her case and treat her fairly at all times. *See id*. at ¶ 45. Similarly, Tomasello was denied the opportunity to have her case heard and was not treated fairly by Judge Kassabian, who had no idea what the conspirators were doing. *See id*. Further, McMahon was denied the opportunity to explain to Judge Kassabian the wrongful actions by the conspirators. *See id*.  Moreover, Greenzweig knew based on her years of experience in the Fairfax County court system that Judge Kassabian would be upset at McMahon if he continued not to have Virginia-barred counsel present at hearings. *See id*. at ¶ 48.

## ARGUMENT

### I.  Standard of Review

A court that is deciding whether a Fed. R. Civ. P. 12(b)(1) motion should be granted "must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F.Supp.3d 94, 100 (D.D.C. 2018) ("*Hawkins*") (quoting *Jeong Seon Han v. Lynch*, 223 F.Supp.3d 95, 103 (D.D.C. 2016) ("*Jeong Seon Han*")) (internal quotation marks and citation omitted). However, a Court should strictly evaluate those allegations as compared to how it accesses the allegations under Rule 12(b)(6). *Hawkins*, 311 F.Supp. at 100 (citing *Jeong Seon Han*, 223 F.Supp. at 103).

For Fed. R. Civ. P. 12(b)(3) motions, "the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Pendleton v. Mukasey*, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) (citation and internal quotations omitted). "Because it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Freeman v. Fallin*, 254 F. Supp. 2d 52, 56 (D.D.C. 2003).

In regard to Fed. R. Civ. P. 12(b)(6) motions, the Supreme Court has stated: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'…A claim has factual plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Ashcroft*") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). In addition, the Supreme Court has held that "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft*, 556 U.S. at 679.

## II.   This Court Can Assert Subject Matter Jurisdiction over Plaintiffs' Claims.

Lewis asserts that the Plaintiffs raise no plausible claim under the federal statutes they bring claims under. *See* Lewis Mem. P. & A. at 9. She also claims erroneously that the Plaintiffs' claims "all occurred in Virginia". *Id.* And lastly, she incorporates Greenzweig and Reilly's *Rooker-Feldman* argument. *Id.* at 10.

First, Lewis' statement regarding where all of the claims occurred completely ignores the fact that Greenzweig sent approximately12 faxes into this jurisdiction, at least the last of which concerned the criminal nature of the conspiracy (*i.e.*, she suggested court dates knowing local counsel would not be present). Second, Plaintiffs incorporate their arguments regarding why the *Rooker-Feldman* doctrine does not apply here on pages 30-32 of their Opposition to Greenzweig and Reilly's Motion to Dismiss, essentially arguing that that doctrine does not apply because the Plaintiffs are not seeking to set aside the judgment in *Tomasello II*.

## III.   Venue in this Judicial District Is Proper and the Private and Public Interest Factors Do Not Weigh in Favor of Transfer to the Eastern District of Virginia

Lewis makes substantially the same argument regarding this judicial district being an improper venue as Greenzweig and Reilly did in their Memorandum to their Motion to Dismiss.

Specifically, she argues that "<u>All</u> substantive acts giving rise to the plaintiffs' claims occurred in Virginia." Lewis Mem. P & A at 10. She also asserts that this "entire case is based on actions taken in Tomasello's litigation in Fairfax County Circuit Court, including Lewis' assistance as Virginia local counsel, so this case should likewise be transferred or dismissed." *Id.* at 11.

In support of those arguments, Lewis relies on an earlier case from this jurisdiction. *Id.* (citing *Weinberger v. Tucker*, 391 F. Supp. 2d 241 (D.D.C. 2005). In that case, the defendant made the substantially same argument Lewis makes in her Memorandum, *i.e.*, "that a significant portion of plaintiffs' complaint describes defendant's conduct in the Commonwealth of Virginia,..". *Weinberger*, 391 F. Supp. 2d at 244. He used two of the main events that led to the lawsuit and that occurred solely in Virginia as part of his argument. *Id.*

The Court agreed with the defendant's arguments and ultimately found, after weighing the necessary factors, that a transfer to Virginia was appropriate under 28 U.S.C. § 1404(a). *Id.*, 391 F. Supp. 2d at 245. It is worth noting, however, that the Court did not say D.C. was an improper venue, and, in fact, reiterated the sentiment of Judge Collyer's opinion in which Plaintiffs rely on in their Opposition to Greenzweig and Reilly's Motion to Dismiss. *See* Pls.' Mem. Opp'n to Greenzweig and Reilly's Mot. Dismiss at 28, 29 (citing *FC Investment Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 11-12 (D.D.C. 2006) ("*FC Investment Group*")). In both cases, the Courts found that venue could be proper in *multiple* judicial districts, an argument that Lewis does not address.

Lewis further argues that there is a genuine "risk of inconsistent judgments regarding the claims asserted in the underlying case and" [that will result in] "squander[ing] judicial resources". Lewis Mem. P & A at 11. However, the decision in both of Tomasello's former cases (*Tomasello I and II*) precluded her from challenging her hostile work environment and related claims arising out of the conduct of her colleagues. This case does not involve any hostile work environment claim, and none of the claims arising out of Tomasello's work environment are

being brought in this case. And, in fact, the Court does not need to decide anything regarding that set of facts to grant the Plaintiffs relief herein as requested. Rather, the relief sought by the Plaintiffs would be the sum of the money awarded by the jury designed to punish the Defendants for participating in a criminal conspiracy, which resulted in Tomasello not receiving her day in Court. She is not herein seeking relief or money for being victimized by a hostile work environment.

To reiterate, the Plaintiffs are arguing that most of the core acts that make up the conspiracy were conducted in or toward the District of Columbia. Again, Plaintiffs contend that the threatening phone calls, misleading faxes where Lewis confirmed dates with Greenzweig that she could not appear, and the bar complaint filed in this jurisdiction by Greenzweig, are acts that allow this Court to serve as a proper venue for hearing Plaintiffs' claims. These acts go to the heart of the criminal conspiracy alleged herein in that they demonstrate the lengths Greenzweig went to in order to satisfy Reilly, her client, and preclude Tomasello from obtaining relief for the heinous discriminatory treatment she was suing to remedy.

As it relates to transfer under 28 U.S.C. § 1404(a) specifically, the burden lies on Lewis and the other Defendants to prove whether or not transfer is appropriate under the circumstances. *See FC Investment Group*, 441 F. Supp. 2d 3 at 13. In evaluating Lewis' proffered reasons for transfer, the Court must perform an "individualized, factually analytical" inquiry to determine whether the action could have been brought in the proposed transferee district, and whether the parties' private interests and the public interests involved weigh in favor of transferring the case or keeping it in the district where the action was originally brought. *See Smith v. Yeager*, 234 F. Supp. 3d 50, 55 (D.D.C. 2017) ("*Yeager*") (internal quotation marks and citations omitted).

Plaintiffs argue that this case could not have been brought in the Eastern District of Virginia as the contract that was entered into among Lewis, McMahon, and Tomasello was entered into in the District of Columbia, McMahon was damaged from the breach of that contract

12

in the District, and Lewis resides in the District on information and belief. In addition, the main overt acts committed in furtherance of the conspiracy were committed in the District (*e.g.*, the threatening phone calls and misleading faxes that kept both McMahon and Judge Kassabian in the dark).

Moreover, the only factors of any kind that Lewis cites to for the proposition that the interests of justice weigh in favor of transferring this matter to the Eastern District of Virginia is their contention that all substantive acts occurred in that district and that the parties involved here already litigated a case there "arising from the same factual underpinning even though different legal issues are involved." Lewis Mem. P & A at 11 (internal quotation marks omitted).

As already discussed herein, all substantive acts did *not* occur in Virginia; rather, they occurred in the District. In addition, Plaintiffs assert that the instant case does not arise out of the same factual underpinning as either *Tomasello I* or *II*. This case is about the malicious obstruction of justice by Greenzweig, Reilly and Lewis of *Tomasello II*. It is not about the claims Tomasello brought against the Fairfax County Fire Department in either of her earlier cases, *i.e.*, Title VII or malicious interference with her employment relationship. *See* Pls.' Mem. Opp'n to Greenzweig and Reilly's Mot. Dismiss at 40-43.

Notwithstanding those arguments, in weighing the private interest factors here, this Court must take into account that the Plaintiffs chose this forum to adjudicate their claims. *See id.* (citing *FC Investment Group LC*, 441 F. Supp. 2d 3 at 13). Also, the Court must consider the convenience for all parties and witnesses to attend proceedings here being that all parties and witnesses are located in the District or close by in Northern Virginia, and none of the Defendants make an argument that it would be difficult for them to secure evidence to defend themselves for by having to litigate in the District, *inter alia. See Yeager*, 234 F. Supp. 3d at 55 (citation omitted). The problem, of course, is that all of them have the necessary information for their defense in their possession already.

As for their argument regarding this Court's weighing of public interest factors, Plaintiffs incorporate their argument from the last paragraph in their Opposition to Greenzweig and Reilly's Motion to Dismiss, where they cite to *FC Investment Group LC* for the proposition that neither this Court nor the E.D.V.A. would have trouble interpreting the laws and claims at issue in this case. *See* Pls.' Mem. Opp'n to Greenzweig and Reilly's Mot. Dismiss at 30. In addition, Plaintiffs argue that for the breach of contract claim in particular, that claim involves two D.C. residents and attorneys (McMahon and Lewis), and as such, this Court has a significant interest in resolving this claim. *Query*: why should McMahon have to litigate in the Eastern District of Virginia as his injuries occurred in D.C.?

### IV.   Tomasello States Plausible Claims against Lewis upon which Relief May Be Granted

#### A.   Tomasello States a Claim against Lewis for Conspiracy to Violate her Rights in Violation of 42 U.S.C. § 1983 and to Obstruct Justice in Violation of 42 U.S.C. § 1985(2)

Lewis also argues that there are no specific factual allegations pled to support a claim under 42 U.S.C. § 1983 against her. Lewis Mem. P & A at 13. She also argues that Plaintiffs "fail to allege any violation of a constitutional or federally protected right as required for a § 1983 action." *Id.*

As a preliminary matter, Plaintiffs would point out that Lewis does not argue that she was not acting under the color of state law when she decided to participate in the criminal conspiracy alleged herein, and indeed, it does not appear that she would be able to argue this. *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980) ("[T]o act under color of state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents.") (internal quotation marks omitted); *Tower v. Glover*, 467 U.S. 914, 923 (1984) ("We conclude that state public defenders are not immune from liability under § 1983 for intentional misconduct, under color of state law, by virtue of alleged

14

conspiratorial action with state officials that deprives their clients of federal rights.") (internal quotation marks omitted).

Second, Lewis' assertion that there are no allegations to support an action under § 1983 as it relates to her is ludicrous. *See*, *e.g.*, Complaint at ¶¶ 4, 31-35, 61. Based solely on a fair reading of the Complaint, it is clear that Plaintiffs have alleged the specific role that Lewis played in the conspiracy with Greenzweig and Reilly.

Third, the right that Lewis and the other Defendants have violated is her right to petition, *i.e.*, right to sue. The Supreme Court has recognized this right in several cases. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[W]e recognized that the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"); *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002) ("We have recognized this right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights, and have explained that the right is implied by the very idea of a government, republican in form.") Tomasello's right to substantive due process under the Fourteenth Amendment has also been violated, as set forth at pages 34-37 of Plaintiffs' Opposition to Greenzweig and Reilly's Motion to Dismiss. Therefore, Plaintiffs have properly alleged a violation of 42 U.S.C. § 1983.

Lewis also tries to argue that she is not implicated in Plaintiffs' 42 U.S.C. § 1985(2) cause of action. This conclusory argument is also ludicrous. Plaintiffs allege in the Complaint that Lewis had two roles in the criminal conspiracy to obstruct justice: 1) Lewis kept Greenzweig apprised of her schedule and dates she could not attend certain hearings without informing McMahon, so that Greenzweig could propose dates to McMahon where she was not available; and 2) she misled McMahon about the status of his *pro hac vice* application so that he would not know when he represented to the Court that he was not actually admitted, which infuriated Judge Kassabian. *See* Complaint at ¶¶ 32, 34.

As a result of her fulfillment of those two duties, when McMahon attended the motions

hearing regarding FCFD's Motion for Reconsideration of the court's earlier decision to deny

FCFD's demurrer on two counts, he was unable to oppose this second demurrer, nor express to

the judge what the situation was. *See id.* at ¶ 35. Consequently, as a formality, the Court

dismissed *Tomasello II* in an opinion a couple of weeks later based on the Motion for

Reconsideration, although it really dismissed the case because Lewis was not present to oppose

that Motion. *See id.* at ¶ 38. Hence, she was directly responsible for obstructing justice in

*Tomasello II* by not allowing Tomasello's meritorious case to move forward.

In addition, Lewis' failure to appear, failure to file a motion to withdraw (which is the

proper procedure), and her misrepresentation of McMahon's bar status had the effect of deterring

Tomasello from testifying in her case. Had Lewis appeared at the hearing on FCFD's Motion for

Reconsideration, she could have successfully opposed that Motion, which had cited no new

caselaw or raised any new arguments for the court to consider. And, assuming that she could

have successfully opposed that Motion, two of Tomasello's claims would have been allowed to

move forward and discovery would have been allowed to ensue.

Had discovery ensued, Tomasello likely would have had her deposition taken, or at least

answered interrogatories under oath, and later testified at trial. Hence, with the case being

dismissed, she never received that chance. And Lewis, as well as the other Defendants, knew that

when Lewis gave Greenzweig her dates that she could not appear, McMahon, as a consequence,

would not be able to oppose that Motion, and it would ultimately be granted.

### B. McMahon States a Claim upon Which Relief May Be Granted against Lewis for Breach of Contract Based on Being a Third-Party Beneficiary of Lewis' Contract with Tomasello

McMahon asserts that he has a breach of contract claim against Lewis as a third-party

beneficiary of her agreement to represent Tomasello in *Tomasello II* because the terms of that

agreement, which were memorialized by McMahon himself (*see* Exhibit 2), clearly contemplated

that Lewis was obligated to accompany McMahon to court proceedings and to take the matter to trial with him if necessary, and agreed to split the 30% contingency fee agreed between Tomasello and McMahon.  McMahon claims that Lewis breached the contract by both maliciously obstructing justice and depriving Tomasello of due process in conspiring with Greenzweig and Reilly and by failing to accompany McMahon to hearings as well as misrepresenting to him that he had been admitted *pro hac vice*.  McMahon argues that, assuming *arguendo* that his damages from Lewis' breach of the contract cannot be precisely calculated, he can, at a minimum, seek nominal damages under Virginia law.

To prove breach of contract under Virginia law, a plaintiff must allege a legally enforceable obligation between the defendant and plaintiff, breached by the defendant,  which breach proximately caused damages to the plaintiff. *Doctors Co. v. Women's Healthcare Associates, Inc*., 285 Va. 566, 740 S.E.2d 523, 527 (2013).

Standing to sue for breach of contract under Virginia law for a non-party to an attorney-client relationship is a question of law to be determined de novo. *Kelly v. Stamos*, 285 Va. 68, 73, 737 S.E.2d 218 (2013). Third-party beneficiary contracts represent a well-recognized exception under Virginia law under which a nonparty can nevertheless enforce a contract under certain circumstances. *Thorsen v. Richmond Society for the Prevention of Cruelty to Animals*, 292 Va. 257, 786 S.E.2d 453; 459 (2016) ("*Thorsen*"); 13 Willison on Contracts § 37:1, at 14-15 (Richard A. Lord ed., 4th ed. 1990 & 2013 rev.). A nonparty must allege facts sufficient to conclude that it was a "clearly and definitely intended beneficiary" of the contract; "[a]n incidental beneficiary has no standing to sue." *Kelly Health Care, Inc., v. Prudential Insurance Co*., 226 Va. 376, 380, 309 S.E.2d 305, 307 (1983) (citing *Valley Landscape Co. v. Rolland*, 218 Va. 257, 260, 237 S.E.2d 120, 122 (1977)). An incidental beneficiary is so far removed from the obligations assumed by the contracting parties that a court will not allow him to sue on that contract, whereas an intended beneficiary is such an integral part of the obligations assumed by

the contracting parties that a court will permit him to sue on that contract. *Thorsen*, 786 S.E.2d at 462-463.

In a breach of contract action, just because "the actual damage sustained is to some extent uncertain and cannot be calculated mathematically to a cent or a dollar, it does not follow that [the] offending party cannot be ... called to account at all." *Kerns v. Wells Fargo Bank, N.A.*, 296 Va. 146, 818 S.E.2d 779, 785 (2018) ("*Kerns*"), quoting *Eckington & Soldiers' Home Ry. v. McDevitt*, 191 U.S. 103, 111 (1903). The party responsible for the breach can be held liable for "nominal damages." *Id.* In Virginia, when no evidence is given of any particular amount of loss, the law declares the right by awarding what it terms 'nominal damages.' *Id.* A recovery of nominal damages, represents an award of a token or symbolic recovery amount that is designed to vindicate plaintiff's rights by making a legal declaration that the plaintiff has been wronged and that the judicial system recognizes that the defendant has been shown culpable under the applicable elements of a claim and burdens of proof, though a measurable amount of loss either has not been established or is not warranted for other reasons on the facts of the case. *Id.*, 818 S.E.2d at 786.

In the instant case, it is clear from the language drafted by McMahon himself in his October 10, 2016 email to Lewis that he clearly and definitely intended to benefit from the contract by securing Lewis as his third local counsel and advising her that she had to accompany him to court proceedings. Also, by agreeing to share the contingency fee with her, he clearly and definitely intended that she would benefit herself from her representation of Tomasello. McMahon was thus an integral part of the obligations assumed by Lewis in representing Tomasello and by Tomasello in paying her attorneys (which had to include an attorney barred in Virginia) and may sue Lewis as a third-party beneficiary of the agreement between Lewis and Tomasello.

As to damages, McMahon can seek damages for Lewis' malicious obstruction of justice and deprivation of due process as to Tomasello because she sabotaged his opportunity to earn a contingency fee in *Tomasello II*. Assuming *arguendo* that such damages are deemed speculative or not subject to proof by reasonable certainty, McMahon can at a minimum still seek nominal damages under *Kerns*. McMahon thus states a cause of action as a third-party beneficiary of Lewis' agreement to represent Tomasello because the Complaint sets forth a prima facie case of breach of contractual obligations by Lewis toward McMahon and damage caused proximately thereby to McMahon.

### C.   Tomasello States a Claim against Lewis for Breach of Contract and Legal Malpractice upon Which Relief May Be Granted

Tomasello contends that Lewis is mischaracterizing her breach of contract and legal malpractice claims as based on Lewis' failure to appear at a hearing when she was no longer associated with Tomasello II as local counsel. *See* Mem. P & A at 16. This mischaracterization spreads to Lewis' claim that the instant case is barred by *res judicata*. Rather, Tomasello is seeking damages for Lewis' malicious obstruction of justice and deprivation of due process in conspiracy with Greenzweig and Reilly.

She is seeking these damages, *inter alia*, under causes of action for breach of contract and legal malpractice. As to the application of *res judicata*, Tomasello previously rebutted this issue at pages 41-43 of her Opposition to Greenzweig and Reilly's Motion to Dismiss. Her argument is that the claims in the instant case are based on different operative facts than in the previous two litigations, are not based on the same transaction or series of transactions as in the previous two litigations, and did not arise until after *Tomasello II* was dismissed.

While Virginia recognizes legal malpractice as an action for breach of contract, see *O'Connell v. Bean*, 263 Va. 741, 556 S.E.2d 741, 743 (2002), it most certainly does recognize

legal malpractice as an independent cause of action. *See Williams v. Joynes*, 278 Va. 57, 677 S.E.2d 261, 264 (2009). A cause of action for legal malpractice has three separate elements: 1) the existence of an attorney-client relationship creating a duty, 2) a breach of that duty by the attorney, and 3) damages that were proximately caused the attorney's breach of duty. *Id.*; *Shipman v. Kruck*, 267 Va. 495, 501, 593 S.E.2d 319, 322 (2004).

To prove breach of contract under Virginia law, a plaintiff must allege a legally enforceable obligation between the defendant and plaintiff, breached by the defendant, which breach proximately caused damages to the plaintiff. *Doctors Co. v. Women's Healthcare Associates, Inc.*, *supra*. Virginia caselaw allows punitive damages for breach of contract "in those exceptional cases where the breach amounts to an independent, willful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression." *Kamlar Corp. v. Haley*, 224 Va. 699, 705, 299 S.E.2d 514 (1983). That is definitely the case here based upon the allegations contained in the Complaint. A single act or occurrence can in certain circumstances support causes of action both for breach of contract and for breach of a duty arising in tort, thus permitting a plaintiff to recover for the loss suffered as a result of the breach and traditional tort damages, including, where appropriate, punitive damages. *Dunn Construction Co. v. Cloney*, 278 Va. 260, 682 S.E.2d 943, 946 (2009).

In the instant case, the gravamen of both Counts III and VI is that Lewis acted maliciously in conspiracy with Greenzweig and Reilly to obstruct justice and prevent Tomasello from prosecuting *Tomasello II* in violation of her right to due process.  The actions Lewis took in misinforming McMahon that he had been admitted *pro hac vice* and being unavailable for hearings were part and parcel of the conspiracy with Greenzweig and Reilly to secure dismissal of *Tomasello II*. Also, these claims were clearly not raised nor could or should they have been raised in *Tomasello II* because they did not arise until after *Tomasello II* was dismissed. Further, Tomasello can seek punitive damages under both counts because she is alleging that Lewis

maliciously acted to prevent Tomasello from prosecuting *Tomasello II*. Her allegations go well beyond breach of a mere contractual obligation to an intentional and malicious undertaking to harm her client.

In the interest of judicial economy, Tomasello, by counsel, agrees to have this Court dismiss Count IV of her Complaint for negligence. Should the Court conclude that Tomasello has not adequately pled breach of contract under Count III and/or legal malpractice under Count VI, it should recognize that Tomasello has the right at this procedural stage to amend either or both counts to more specifically allege that Lewis breached the duty she owed to Tomasello by conspiring to obstruct justice and prevent Tomasello from prosecuting the state *Tomasello* case, *i.e*, *Tomasello II*.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be DENIED.

Respectfully submitted,

____/s/_____
Mark G. Chalpin, Esq.
(DC Bar #366794)
116 Billingsgate Lane
Gaithersburg, MD 20877
Tel: (301) 990-4900
Fax: (832) 201-7392
mark.chalpin@gmail.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum of Points and Authorities in Support of Opposition to Defendant Hasina Lewis' Motion to Dismiss was filed and served via CM/ECF on this 20th day of May, 2019, upon the following parties of record:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314

John D. McGavin, Esq
Bancroft, McGavin, Horvath and Judkins, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, VA 22030

_____/s/_____
Mark G. Chalpin